# UNITED SATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CHRIS COLOGNE and CATHERINE COLOGNE,** | * | **CIVIL ACTION NO. 12-735** |
| | * | |
| | * | **JUDGE:** Eldon E. Fallon |
| Plaintiffs | * | |
| | * | **MAGISTRATE:** Daniel E. Knowles III |
| vs. | * | |
| | * | |
| **SHELL OIL COMPANY, ET AL.** | * | |
| | * | |
| Defendants. | * | |

*************************************************************************************

## MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND OPINIONS OF JOHN SPENCER

Plaintiff, Chris Cologne, through undersigned counsel, respectfully requests that this Honorable Court grant this motion to exclude the testimony of Defendants' experts, John Spencer. Mr. Spencer's testimony  should be excluded because his opinions are not the product of reliable scientific methods and principles. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[1] and Rule 702 of the Federal Rules of Evidence (FRE) require that an expert's opinion be generally accepted in the scientific community and, be the product of reliable methods.[2]

## Background

Mr. Cologne worked full time for **Texaco Inc.** (hereinafter "**Texaco**") from 1970 to 1976. During this time he repaired leaking equipment and flowlines for crude oil, produced water, and

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[2] The Eastern District of Louisiana has issued several decisions addressing *Daubert* challenges to witnesses. See generally *Gustings v. Travelers & Standard Fire Ins. Co.,* No. Civ. A 07-4443, 2008 WL 4948837 (E.D. La. Nov. 18, 2008) (Engelhardt, J.) (discussing *Daubert* requirements); *Wyeth v. Rowan Companies, Inc.*, No. Civ. A 07-2823, 2008 WL 3975625 (E.D. La. Aug. 26, 2008) (Engelhardt, J.) (same); *Wilson v. Thompson/Center Arms Co., Inc.,* No. Civ. A 05-6493, 2007 WL 4727639 (E.D. La. Nov. 1, 2007) (Engelhardt, J.) (same); *NREC Power Systems, Inc. v. Miba Bearings U.S. L.L.C.,* No. Civ. A 05-4205, 2007 WL 2264756 (E.D. La. Aug. 2, 2007) (Engelhardt, J.). *See also U.S. v. Bennett,* No. 06- 41233, 258 Fed.Appx. 671 (5th Cir. Dec. 13, 2007) (not designated for publication) (discussing *Daubert* requirements), *cert. denied,* --- U.S. ---, 128 S.Ct. 2904, 171 L.Ed.2d 844 (2008).

liquid gas condensate collection systems.  He repaired pumps for crude oil and produced water, as well as repaired leaks in tank farms, pipes, and tanks.  Additionally, Mr. Cologne was required to gauge hydrocarbon tanks on a regular basis. As a result of these activities Mr. Cologne was exposed to benzene containing hydrocarbons from crude oil and a natural gas condensate on a daily basis.

On April 25, 2011, Mr. Cologne was diagnosed with diffuse Large B-cell non-Hodgkin's lymphoma.[3]

### Law and Arguments

**I.    Daubert Standard**

In *Daubert v. Merrill Dow Phar.*, the Supreme Court established a two part test for the admission of expert testimony:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the **reasoning or methodology underlying the testimony is scientifically valid** and of whether that **reasoning or methodology properly can be applied to the facts in issue**.[4]

Under the first part of the analysis, the court is required to "assess carefully the methodology, reasoning, or technique employed by the expert."[5]  Where the expert's opinions are based on scientifically valid principals, they are admissible under Rule 702 of the Federal Rules of Evidence). [6] Subjective belief and unsupported speculation do not meet the criteria for admissibility.[7]

Under the second portion of the Supreme Court's analysis,  a court must determine the fit or relevancy of the opinions and evidence.  The Court held:

> Scientific testimony is relevant only if the expert's reasoning or methodology can be

---

[3] Medical Records, in globo, **Exhibit 1**
[4] *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579 at 593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[5] *Wynacht v. Beckman Instruments, Inc.,* 113 F.Supp. 2d 1205, 1207 (E.D.Tenn. 2000)
[6] *Id.*
[7] *Id.*

properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered.[8]

In summary, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and…whether that reasoning or methodology properly can be applied to the facts in issue." As the Seventh Circuit described it "the suggested scientific testimony must 'fit' the issue to which the expert is testifying."[9]

The Fifth Circuit in *Guillory v. Domtar Indus. Inc.,* held that **expert testimony** "which was not based upon the facts in the record but on altered facts and speculation" was properly excluded."[10] Additionally, Courts have held that "Expert testimony... is inadmissible when the facts upon which the expert bases his testimony contradict the evidence."[11]

The United States Fifth Circuit has explained that nothing in FRE 703 requires a court to admit an opinion based on **facts that are indisputably wrong and that "an opinion based totally on incorrect facts will not speak to the case at hand and hence will be irrelevant."[12]** An opinion based upon incorrect or incomplete facts should be excluded because it "will not advance the express goal of assisting the trier of fact."[13] The facts a proffered expert relies upon must be "the same type of facts as other experts in the same field reasonably rely upon in forming their

---

[8] *In re Vioxx Products Liability Litigation, 401 F. Supp. 2d 565 at 573 (E.D. La. 2005)citing Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)

[9] O'Conner v. Commonwealth Edison Co. 13 F. 3d 1090 n. 17 (7th Cir.) cert. denied. 512 U.S. 1122, 114 S.C. 2711, 129 L.E.D. 2d 838 (1994)

[10] *Guillory v. Domtar Industries Inc.,* 95 F.3d 1320, 1331 (1996)

[11] *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) citing *United States v. Chaney,* 577 F.2d 433, 435 (7th Cir.1978).

[12] *Christophersen v. Allied-Signal Corp.,* 939 F. 2d 1106, 1114 (5th Cir. 1991) (en banc) (overruled on other grounds, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 587 n. 5, 113 S. Ct. 2786, 2793 n. 5, 125 L.Ed.2d 469 (1993)), quoted with approval by *Bradley v. Armstrong Rubber Co.*, 130 F.3d 168 (5th Cir. 1997), called into doubt on other grounds, *Smolensky v. McDaniel,* 144F.Supp.2d 611 (E.D. La. 2001). (emphasis added)

[13] *Christophersen, supra,* 939 F.2d at 1114-15.

opinions."[14]

> The Fifth Circuit held:
> Certainly nothing in Rule 703 requires a court to admit an opinion based on facts that are indisputably wrong. Even if Rule 703 will not require the exclusion of such an unfounded opinion, general principles of relevance will. In other words, an opinion based totally on incorrect facts will not speak to the case at hand and hence will be irrelevant. In any event such an opinion will not advance the express goal of "assisting the trier of fact" under rule 702.... Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all. Both analyses result in pure speculation.[15]

Personal knowledge and experience are not enough to permit expert testimony.[16] Thus, conjecture, hypothesis, "subjective belief, or unsupported speculation" are impermissible bases for expert opinion and must be discarded.[17] In short, *Daubert* commands that in court, "science must do the speaking, not merely the scientist."[18]

Mr. Spencer ignores the evidence on the record and instead substitutes his own opinions for the evidence, relies on dissimilar sampling results, unreliable summaries,  and selectively picked data in order to report lower benzene measurements than actually existed for the type and nature of work Mr. Cologne performed. The defendants have failed to carry their burden regarding the proposed expert testimony of John Spencer.

### A.  Mr. Spencer relied on air sample results for dissimilar circumstances, and failed to disclose this discrepancy in his report

#### 1.  Air sampling

The benzene exposure monitoring data produced by TDPI and which Mr. Spencer relied upon appear to be for automatic, not manual gauging and are for shorter time periods than the

---

[14] *Christophersen, supra*, 939 F.2d at 1110.

[15] *Guillory v. Domtar Industries Inc.,* 95 F.3d 1320, 1331 (1996)

[16] *United States v. Fredette*, 315 F. 3d 1235, 1239-40 (10th Cir. 2003).

[17] *Daubert*, 113 S. Ct. at 2786, 2795; *Boutte v. Nissan Motor Corp.,* 663 So.2d 154, 159 (La. Ct. App. 3d Cir. 1995); *Rowe v. State Farm Mut. Auto Ins.* Co., 670 So.2d 718, 729 (La. Ct. App. 3d Cir. 1996), writ denied, 673 So. 2d 611 (La. 1996).

[18] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F. 3d 1311, 1315-16 (9th Cir. 1995).

actual time it took to gauge and sample the tanks.. Therefore, the data used by Mr. Spencer does not

measure exposure in circumstances similar to Mr. Cologne's exposure.

As noted by Dr. Infante, the Texaco's data relied upon by Spencer were made ten months to

two years after the time period at issue in this litigation. For this reason alone the measurements are

suspect.  This was well after TDPI was aware of the federal OSHA emergency temporary benzene

standard in May of 1977. (The implementation of the emergency standard was stayed by the First

Circuit court of Appeals  on May  20, 1977).  OSHA published a proposed permanent standard by

the end of May 1977.  TDPI's own documents indicate that Texaco was aware of the proposed

permanent standards in January 1978.[19]

Mr. Spencer opined on testing conducted by Texaco in 1977 stating:

Texaco conducted air sampling for benzene in October and November 1977 in a
Texas oil field in the breathing zone of pumpers, roustabouts, and plant operators
(Cologne-Tdpi001739- CologneTdpi001740). Specific details regarding the tasks and
products for each individual sample results were not available. However, Texaco
employee, Herschel Hobson, reported in a memorandum dated 3 January 1978
**(CologneTdpi001739- CologneTdpi001740)** that the benzene concentration of a
total of 16 samples collected over a 383 to 494 minute period ranged from <0.01
ppm to 0.2 ppm.[20]

Later documents produced by TDPI containing details of these samples taken during

October through November 1977 time tell a different story.[21]

| Document | # tanks gauged | time to complete | front filter back of filter (ppm) | back of filter (ppm) | total ppm benzene (PPM) |
|---|---|---|---|---|---|
| TDPI003656 | 7 tanks | 5.42 minutes | < 1.8 | < 1.8 | 3.6 |
| TDPI003658 | 3 stock tanks | 2.58 minutes | < 3.8 | < 3.8 | 7.6 |
| TDPI003659 | 2 stock tanks | 1.57 minutes | < 6.1 | 61 | 67.1 |
| TDPI003660 | 2 stock tanks | 2.72 min. | 35 | 35 | 70 |

---

[19] TDPI001739-001741, **Exhibit 1**
[20] Report John Spencer, page 5, **Exhibit 2**
[21] Cologne- TDPI003656 through 003675, **Exhibit 3**

| TDPI003661 | 2 Stock tanks | 2.03 min. | < 4.7 | 37 | 41.7 |
| TDPI003662 | 3 stock tanks | 2.62 | 33 | 3.7 | 36.7 |
| TDPI003663 | 3 stock tanks | 2.27 min. | < 4.3 | < 4.3 | 8.6 |
| TDPI003664 | three stock tanks | 2.6 min. | < 2.0 | < 2.0 | < 4 .0 |
| TDPI003665 | 5 stock tanks, one gun-barrel | 6.8 min | < 0.76 | < 0.76 | 1.52 |
| TDPI003666 | 4 stock tanks | 2.48 min | < 2.1 | < 2.1 | < 4.2 |
| TDPI003667 | 2 stock tanks | 1.58 min. | 16 | <3.3 | 19.3 |
| TDPI003671 | 2 stock tanks | 2.25 min. | < 2.2 | < 2.2 | < 4.4 |
| TDPI003672 | 2 stock tanks | 2.33 min | < 4.2 | < 4.2 | < 8.4 |
| TDPI003673 | 5 stock tanks | 3 min | <3.2 | < 3.2 | < 6.4 |
| TDPI003674 | 3 stock tanks (for gas wells) | 2.83 min. | < 3.5 | < 3.5 | <7 |
| TDPI003675 | 3 stock tanks | 3.45 min | <2.8 | < 2.8 | < 5.6 |

**Table A**

The charcoal filters used for these types of air samples contain a filter chamber that is split into two parts: a front and back.  The correct measurement of the contaminate is the sum of the results from both the front and back filters.[22]  Additionally, if the back filter measurement is ≥25% of the measurement of the front filter, this indicates that the filter has been **saturated**  (also referred to as "breakthrough").  This this indicates there was inadequate capture of the contaminate being measured.[23]   Saturation, means the material was flowing through the sample chambers without being measured (either because the air velocity was to great, or the level of contaminate in the area measured was too great). All but two of Texaco's measurement show such **saturation**, which strongly indicates that actual benzene levels were higher than those recorded (possibly much higher) than the filter measurements.[24]   In his depositions, Mr. Spencer admitted  he ignored the higher measurements because the back of the filter exceed 25% of the front.[25]  These samples in which the back filter measured ≥25 percent of the first – should have been reported as the MINIMUM results

---

[22] CDC. VII. Appendix I, compliance Method Sampling and Analytical procedures for Determination of Toluene,  Pp. 86, http://www.cdc.gov/niosh/pdfs/7311023d.pdf, **Exhibit 4**
[23] Travelers, Air Sampling field Instruction, Industrial Hygiene Laboratory,  Page 5, **Exhibit 5**
[24] Travelers, Air Sampling field Instruction, Industrial Hygiene Laboratory.  Page 5. **Exhibit 5**
[25] Deposition John Spencer (12/17/2013) at 79-80, **Exhibit 6**

(indicating that the true level of benzene was at least at these levels) – instead, Mr. Spencer hand selected only the lower data measurements to provide a purposely biased measurement which underreports the true benzene level.

It is clear from Mr. Spencer's testimony that he simply didn't adequately evaluate the result – he relied on summaries provided by others, and allegedly relied on the opinion of  Mr. Herschel Hobson to determine whether to include several of these samples.  Mr. Spencer testified:

> Q Okay. And do you see the results on the bottom, the back of the charcoal tube was 61 parts per million for an employee who gauged crude oil?
> A Yes. According to the OSHA regulations and standard, you have to discard this data because something was wrong with the sample.
> Q Why is that, Mr. Spencer?
> A It has more than 25 percent of a contaminate on the back-up section of the charcoal tube. So something -- and I think this was one of the data points that Herschel Hobson, the industrial hygienist for Texaco, pointed out where it was data that's not usable and the sampling had to be repeated.
> Q Okay.
> A That happens from time --
> Q But --
> A -- to time.
> Q Let's turn the page. Do you see the next sample of crude oil dated 10/31/77, "Employee gauged two tanks." And the front sample is 35 parts per million, and back --
> A Right.
> Q -- tube is 35. So that would give a result 70 parts per million in the air?
> A No.
> Q Correct?
> A No, that's not correct. Again, you cannot  use this data. And, again, as pointed out by Herschel Hobson -- who's actually now a plaintiff's attorney -- that this data is not usable. There was something wrong with the collection method or the analytical procedure, something happened...[26]

Later  he testifies..

> Q Okay. And you -- and you disagree with the results in those four --
> A I don't disagree.
> Q -- documents that was produced by Texaco?
> A No. I absolutely agree with the findings of the industrial hygienist, and how to properly assess and analyze that data. And there was a lot of other data that the industrial hygienist was -- from Texaco that was also putting in perspective with this data the same data that I have referenced in my reports. And all that data points to

---

[26] Deposition John Spencer (12/17/2013) at 79-80, **Exhibit 6**

much lower levels of exposure. So this data, it was an outlier, there were problems with the data, and that's why he didn't use these data points.[27]

It is clear that Mr. Spencer does not understand the basis he claims for rejecting the samples, he does not understand the significance of the >25% rule he stubbornly recites. These samples were simply rejected because they were higher than the other samples- they were "outliers" according to Mr. Spencer[28] – samples for other task or for which there is conveniently not original sampling logs or analytical analysis.

Dr. Spencer blindly relies on the Hobson memorandum – which  Mr. Hobson  believed indicates these samples should be repeated for at least 15 minutes.  No original analytical results  or field notes have been produced for any other short term samples of tank gauging activities – yet Mr. Spencer did not resample when he visited the Paradis field.  He is clearly content to base his opinions on unreliable data – so long as that data conforms with his preconceived notions of little or no benzene exposure.

Even if we eliminate only those samples for gauging tanks that do not exhibit **saturation** or breakthrough, we are left with two valid sample results (ignored by Spencer), one finding **36.7 ppm** benzene in 2.62 minutes and another resulting in **19.3 ppm** benzene in 1.58 minutes, both of these were measurement of personal air samples taken within the breathing zone of an individual worker. Yet the highest short-term measurement acknowledged by Mr. Spencer's is in Table 1 of Mr. report, and only reports short-term sample of 9.5 ppm (which likely corresponds to the 9.5 ppm result on page TDPI 001813). He disregards these other results showing higher air monitoring results.[29]

Additionally, Table 1 of Spencer's report discusses 53 short-term air samples collected for pumpers in the monitoring records that he cited. Mr. Spencer failed to indicate that among these 53

---

[27] Deposition John Spencer (12/17/2013) at 84, **Exhibit 6**
[28] Deposition John Spencer (12/17/2013) at 84, **Exhibit 6**
[29] Supplemental Report Dr. Nicas (10/29/13) page 2, **Exhibit 7**

samples, **only 13 samples** were clearly noted to involve tank gauging (TDPI 001810, 001818-001819, 001821-001822). Even more importantly, the voluminous Excel spreadsheet Mr. Spencer relied upon for his data only contains one measurement for each sample – it does not report both the front and back filter analysis.[30]  Not only has this original sampling information not been produced, but according to Mr. Spencer's report he did not review it.   Without the original data we don't really know what these numbers represent, and no determination can be made about filter saturation or accuracy of the results.  If Mr. Spence is consistent with his methodology – he could not use these samples because he does not have information to evaluate whether the back filter was ≥25% of the front filter. Apparently Mr. Spencer's methodology is just to select the lowest measurements and discard the higher measurements.  As a result, the air sampling data on Table I of Mr. Spencer's report are based  on unreliable data summaries,  for  job tasks that are not similar to those conducted by Mr. Cologne during his gauging of tanks.  (Note Dr. Nicas did not provide calculations for Mr. Cologne's exposure while working on other job task, he estimated exposures based on time spent gauging tanks only- effectively assuming the other hours were zero exposure.).

The  OSHA  maximum  allowable  short  term  exposure  limit  for  benzene  between  1974 through 1976 was  50 ppm. [31]  During this time period OSHA had three limits: (1) an 8-hr. TWA of 10 ppm, (2) a 10-minute ceiling limit of 25 ppm, and **(3) a maximum peak concentration of 50 ppm never to be exceeded.**[32]  Through his lack of understanding, Mr. Spencer claims none of the measurements at Texaco exceeded OSHA limits.[33]   Mr. Spencer's testimony, indicating that he believes the 50 ppm limit  is an 8 hr. time weighted average demonstrates his lack of understanding and lack of familiarity with the OSHA standard.[34]

---

[30] Excel spreadsheet, Sample analysis produced by Texaco, **Exhibit 8**
[31] 29 CFR 1910.1000, **Exhibit 9**
[32] *Id.*
[33] Deposition John Spencer (12/17/2013) at 93, **Exhibit 6**
[34] Id.

Although Mr. Spencer had the opportunity he did not conduct any air monitoring when he was at the Paridis field, he claimed there was no need- he had plenty of samples.[35]   Yet testimony and review of the data show the only analytical results we have for air monitoring for gauging activates are the 16 results in   TDPI – COLOGNE003635-3675, and Mr. Spencer specifically ignored those result claiming that these samples were not valid and needed to be repeated. [36]

The time it takes to gauge a tanks is another area where Mr. Spencer bases his opinions on unreliable data and his own opinions, rather than the evidence in the case.  Mr. Spencer testifies that he allegedly went on a site visit to Paradis field in November (although he has produced no notes from his site visit and alleged conversations with employees.)   Another inconsistency can be observed with the sample times for these  analytical results, as noted in Table A above the measured time for the samples are unrealistically short, even for the sample times Mr. Spencer alleged he observed or  learned from his visit to the field. Mr. Spencer should have re-sampled, rather than rely on incomplete, and inaccurate date, yet he chose not to do so.

Mr. Spencer testified that –" I have actually sampled workers gauging tanks and it takes less than three minutes"[37]  (It does not appear that he timed this procedure in the Paradis field, or actually witnesses anyone performing this activity at the Paradis field).

> Q And based on that, how long -- how long -- well, do you have credible evidence to suggest that -- that the period of time to actually gauge a tank would be something less than two minutes, or in the range of two --  in the range of two minutes or less, as opposed to 10 12 minutes?
> A Yes. I mean, that was -- that came from, one, my own experience working with gaugers gauging crude oil tanks, sitting on top of the tanks the same way Mr. Cologne testified to, and -- and making notations in how long that took.[38]

No notes of such timing or sampling have been produced, so there is no actual supporting evidence for Mr. Spencer's claims and opinions.  Mr. Spencer claims the workers in Paradis field told him it

[35] Deposition John Spencer (12/17/2013) at 93, **Exhibit 6**
[36] TDPI – COLOGNE003635-3675, **Exhibit 3**; Deposition John Spencer (12/17/2013) at 79-80, **Exhibit 6**
[37] Deposition John Spencer (12/17/2013) at 89, **Exhibit 6**
[38] Deposition John Spencer (12/17/2013) at 104, **Exhibit 6**

takes one to two minutes to gauge a tank – yet in the samples discussed in his Table one – which Mr. Spencer alleges is for manual gauging.  Even if Mr. Spencer actually preformed the alleges site visit, interviews, took notes and photographs as he claims in his depositions—his failure to produce any of this supporting documents is in violation of Rule 26 and the Scheduling order.  Under the Rules of Civil Procedure, he may not rely on material he has not produced.

### 2. Mr. Spencer's reliance on Moen, et al. studies are misplaced

Page 6 of his report Mr. Spencer states "in an effort to understand the gauging of tanks" containing crude oil, he looked at two papers by Moen, et al., [ Moen 1995a labeled Moen 1995b]. Mr. Spencer said that in Moen 1995(a), "four long-term samples were collected for benzene during manual tank gauging," with 8-hr. TWA values ranging from .01 to .09 ppm. He said these gauging data were consistent with the Texaco gauging data. However, the data in Moen 1995a are <u>not</u> relevant to Mr. Cologne's gauging activities, and Mr. Spencer's description misrepresented the four 8-hour measurements as pertaining to manual gauging only.

In Moen 1995b, none of the  measurements were taken onboard tankers hauling crude oil (only  gasoline, naphtha, jet fuel and gas-oil).  Although  a comparison of Tables 1 and Table 2 in the report demonstrates the difference that can be made between using an automated system  versus a manual system like an open hatch to vent pressure.  In the tankers with automatic pressure vacuum valves—there were very low levels of benzene yet the tanker that loaded with open hatches in order to equalize pressure had benzene levels in air significantly higher (from 7.5 ppm to 55.2 ppm.)  This study merely supports the arguments that Mr. Spencer used inappropriate values and dissimilar to circumstances to under-report Mr. Cologne's benzene exposure.   The low levels measured on 7 of the 8 boats in this study are for chemicals other than crude oil and in closed system – completely unlike the open hatch sampling procedures used at Texaco. In **Moen 1995B**

the air monitoring for the  open hatch load was 18 to 138 time greater than the  area air morning  on the tankers with  the pressure relieve valve system.

According to Moen **1995a,** all the tankers had closed loading systems (the compartment hatches were closed during loading) and "inert gas was used on all the crude oil tankers . . ." That is, "inert gas . . . is pumped into the tanks to reduce the risk of fire and explosions." Pumping inert gas into a tank headspace and venting that gas serves to continually purge vapors from the tank headspace. It is akin to pumping air into (and exhausting air from) a room while vapor is being emitted into the room air. The result is that the headspace vapor concentration is kept relatively low. This inert gas purging situation is entirely different from Mr. Cologne's gauging of a previously sealed crude oil tank that was not subject to purging of the headspace vapors, akin to opening up a closed room in which the vapor has been permitted to build up to a relatively high level.[39]

The Moen **1995a** paper also measures dissimilar situations.  Although the cargo was crude oil the study clearly states,  "All crude oil tankers except one had an automatic cargo level indication system, operated from a control room."[40] (This notation is even underlined in the document produced on behalf of Mr. Spencer). Thus with the exceptions of one tanker's use of a device termed a "manual moisture control (MCC) there is no evidence of manual gauging.  Additionally even the manual gaging with the  MCC  was limited to a tank opening of  less than 25 mm ( less than 1 inch), which is a much smaller tank opening than described by Mr. Temple in this case. (Mr. Temple describe the hatch as oval in shape with dimension of approximately 18 inches by 8 inches[41]) is no description of any dimensions of a compartment opening nor of the time it took to gauge a crude oil level in a tank. Table 111 of the paper lists personal monitoring for "cargo level indication" that involved integrative sampling times of 8 hours. Any 8-hour period may have involved just one

---

[39] Moen1995b, **Exhibit 9 (in globo);** Supplemental Report of Dr. Nicas, page 5, **exhibit 7**
[40] Moen 1995a, **Exhibit 9 (in globo)**
[41] Affidavit Charles Temple, **Exhibit 10**

gauging episode taking several minutes. Again, there is absolutely no statement that gauging was performed for 8 hours as Mr. Spencer implied. The < 25 mm opening on a MMC device suggests a circular opening about one inch in diameter such that the opening would have area 0.785 square inch or ,00545 square foot. In contrast, the hatch opening on a crude oil storage tank described by Mr. Cologne had an estimated area of 2.44 square feet, or a 447-fold greater area than a MMC device.[42]

### 3.  Time spent gauging tanks

Mr. Spencer disputes the 10-15 minutes tank gauging time period which Mr. Temple and Mr. Cologne have testified to.  In fact, Mr. Spencer ignores this data altogether, and instead relies on his own opinions.

According to Texaco's documents Cologne-TDPI003656  - 003675, which list the number of tanks gauged and the time to complete the measurement, it took on the order of one minute to gauge one tank.[43] (See summary in Table A above).   This includes Cologne-TDPI 003675, which specifically notes it is for tanks at wells "considered gas wells".  Gas must be kept in a sealed environment, so it must be sampled through automatic gauging.  Yet the samples time , one  to two minutes, is the same as the gauging samples from crude oil tanks.  This strongly suggest that the measurements were from automatic gaging—not manual gaging as Mr. Spencer suggest.  There is no actual testimony to suggest that the gauging methods in all of the field measurements Mr. Spencer relies upon were taken in the same manner as  those taken in the Paradis field in 1974-1976.

In contrast the testimony of  Mr. Temple  indicates it took said it took about ten minutes to manually gauge one crude oil tank, not including the time it took to climb to the top of the tank to

---

[42] Supplemental Report Dr. Nicas, **Exhibit 7**
[43] Cologne- TDPI003656 through 003675, **Exhibit 1**

access the hatch. (15 minutes if they were also taking measurements with the "Oil Thief" tool).[44] October/November 1977 gauging times were about ten-fold lower than Mr. Cologne's time.  The short sampling time of the Texaco measurements also indicates that such measurements were not manual, but rather the air monitoring was performed during automatic gauging.

In his deposition, Mr. Spencer indicated that he spoke to workers in the Paradis field in November 2013[45]—but he provides no identification of the individuals he spoke with, no notes of his conversations, and we certainly have no idea if any of these individuals were even aware of the manner in which samples were taken in the 1970's.  These are purely speculative opinions – and no actual evidence or witnesses are provided to support Mr. Spencer's theories. There is of course no proof of Mr. Spencer assertion because Plaintiff's counsel were not notified of such an experiment and permitted to view or witness this "sampling".  Additionally, Mr. Spencer's one minute time period would be unlikely to provide an accurate tank gauging record.  While accuracy of the tank gauging may not have been important for Mr. Spencer (whose goal was to demonstrate no exposure to benzene vapors) – it was critical for Mr. Cologne and Mr. Temple to accurately measure the level of product in each tank in order do their jobs correctly.    Mr. Cologne was required to maintain accurate records of the volume of fluids – whether crude oil or produced water – in the tanks.

Mr. Spencer simply ignores the physics of the situation – crude oil is a viscous fluid.  Even with a weighted tape measure,  the measuring tape must be lowered into the tank slowly to prevent the plumb bob and measuring tape from floating, and to prevent spooling excess tape into the tank after the plumb bob has hit the bottom of the tank.   Mr. Spencer may have produced a measurement in one minute or less – but it is unlikely that such a measurement was an accurate one.

Mr. Spencer is not an experienced pumper, or tank gauger – he had not been trained to do this work, nor has he ever been required to do so accurately as an obligation of his job ( at least

---

[44] Affidavit Charles Temple, **Exhibit 10**
[45] Deposition John Spencer (12/17/2013) at 92, **Exhibit 6**

there are no indication he has such history of skills on his resume).  Therefore, to substitute Mr.

Spencer's personal opinions and lack of experience – over the testimony of Mr. Cologne and Mr.

Temple who actually worked in the Paradis field, and performed the gauging is absurd.

Mr. Cologne received exposures to benzene while manually gauging tanks in the Paradis

field.[46]   A co-worker Mr. Charles Temple described the process of manually gauging tanks as

follows:

> When performing manual gauging we would climb the steps to the top of the tank,
> open the hatch, unroll the stainless steel tape measure with a brass plumb bob on
> the end, and **measured the tank twice to make sure we had a good reading.**  This
> would cause us to be at the open hatch while gauging for 10 minutes.[47]
>
> To perform a typical tank gauging, we climbed up the steps  to the catwalk on top of
> the tank.  While bending over, we opened the tank hatch which was oval in shape
> and 14 inches by 8 inches in size.  When we opened the tank, the fumes were
> extremely heavy, and they remained fairly heavy throughout the gauging. To gauge
> how much product was in the tank, we unrolled a stainless steel measuring tape that
> was 25 feet long and had a brass plumb bob on the end.  We measured twice to be
> sure that we had good readings.  The tanks were usually between one-half and three-
> quarter full when we gauged them.  Crude oil was added to each storage tank on a
> weekly basis
>
> Some of the tanks had automatic gauges, but they did not work, so we had to
> manually gauge the tanks.  We never used the automatic gauges.
>
> Also, as a pumper and relief pumper, we would spend considerable time in the tank
> hatch opening to measure the water in the stock tanks during a process  called
> "thiefing the tanks."  To accomplish this task, we would open the hatch and lower a
> device made by WH Curtain called and "Oil Thief," which was a brass cylindrical
> barrel that was about 2' in diameter and 18" long and was connected to a chain.
> When the devise was lowered into the tank, it had a trigger mechanism to collect the
> sample.  We thiefed the tanks during the same time that we gauged them.  Thiefing
> the tanks and gauging the tanks would take about 15 minutes together each time that
> we did it.[48]
>
> While doing these activities, it took ten minutes from the time we opened the hatch
> until we closed it.  During this entire ten minutes, we were bent over the top of the
> hatch looking down into the tanks without faces within two feet of the opening. Due

---

[46] Deposition Chris Cologne (4/11/2013) at 89-81, **Exhibit 11**
[47] Affidavit Charles Temple 10-29-2013 (emphasis added) , **Exhibit 10**
[48] Affidavit, Charles Temple, July 5, 2013, **Exhibit 10**

to the fumes at the hatch opening, at times we experiences light headedness and dizziness.[49]

Additionally, Mr. Temple confirmed that "in the years 1973-1974, Christopher cologne worked as a fill-in pumper."[50]

Mr. Spencer's methodology of substituting his inexperienced duplication of the task that is described in detail by the workers who performed the task – is not a reliable scientific methodology nor one that would be reasonably relied upon by experts in the field of industrial hygiene. Mr. Spencer's opinions concerning the time Mr. Cologne was exposed to elevated levels of benzene from gauging tanks is contrary to the available evidence in this case.

### 4. Reliance on testimony of Doug Mathern

Mr. Spencer relies on an alleged conversation with Doug Mathern, a former Texaco employee, as support for his conclusion that tank gauging procedures in Louisiana and Texas were essentially the same. Mr. Spencer used this alleged conversation so he can rely on the Texaco air monitoring results discussed above – which were taken for employees in Texas, not in Paradis, Louisiana. No recorded testimony has been provided or notes of this conversation were produced. To date, TDPI has not produced any testimony or documentary evidence demonstrating that Mr. Mathern worked in the Paradis field, or that he worked at allegedly similar facilities.

Both Mr. Cologne and Mr. Temple testified that Mr. Doug Mathern was not working in the Paradis field at the time of Mr. Cologne's complaint (between 1970 and 1976.) Mr. Cologne testified that Mr. Mathern didn't begin working in the Paradis field until the 1980's. [51] Mr. Temple also testified that Mr. Mathern did not work in the Paradis field between 1970 and 1976.[52]

---

[49] Affidavit, Charles Temple, July 5, 2013, **Exhibit 10**
[50] Affidavit Charles Temple, **Exhibit 10**
[51] Chris Cologne Depositions page 101:12-102:24, **Exhibit 11**
[52] Affidavit Charles Temple, **Exhibit 10**

**B.  Mr. Spencer's evaluation of benzene in crude oil ignores available evidence**

Mr. Spencer criticizes Dr. Kopstein's determination of the  benzene concentration in crude oil.  Mr. Spencer alleged that Dr. Kopstein relies solely on MSDS sheets, which he claims are an unreliable source.   This is inaccurate and misleading.  Dr. Kopstein relied on numerous sources, including:

- **March 31, 1995 Shell Oil memorandum from J.J. Conklin to B. Zwiers** – an internal shell memorandum that reports Shell health and Safety departments evaluation of benzene not only in their own products, but of purchased produdes including Kerr-McGee Crude Oil and Hill Petroleum Crude Oil, and an identification of the ppm benzene in crude oil from various states, including Louisiana.
- **"Benzene Content of Crudes", EMSALMOB 02691, February 23, 1988** - an memorandum from the Mobil Research and Development Corp.
- **Shell Development Corporation. "Information Paper The Benzene Situation January 1980. Shell-Bishop 222153**- a study performed by Shell International Research on the source of benzene .
- **Shell Oil. March 28, 1988 memorandum from Carolyn Phillips. "Benzene in Crude Oils"-** Shell internal memorandum identifying products identified by Shell as containing ≥0.5% benzene
- **Texaco. "OSHA/EPA Regulations for Benzene Crude Oils and Gas Condensates" August 28, 1977**- an internal **Texaco** memorandum circulated in response to the proposed OSHA benzene standards.
- **Valero. MSDS 501 for Crude Oil. Brand names Valero, Diamond Shamrock, Ultramar, Beacon, Total** – MSDS sheets

Mr. Spencer ignored all of these sources, including Texaco's own documents, and instead relied on a study by **Grissle and Coleman 1979.**  From this study, Mr. Spencer apparently averaged the measurements from Louisiana Crude Oil  and Texas Crude Oil in order to report lower  % weight of benzene.  Unfortunately, what this study lacks is any indication that the samples were somehow representative of the entire states of Texas and Louisiana. The authors do not purport this study to be a representative sampling of benzene in crude oil from these states—its purpose is simply to evaluate a method of measuring benzene in crude oil.  These measurements of benzene in

crude oil range from non-detect up to .415 % weight of benzene.  The upper range in this study compares with the average value used by Dr. Kopstein of .545 % by weight.

### C. Reliance on summaries where original analytical data has not been reviewed or verified.

Mr. Spencer's supplemental report also relied on as spreadsheet summary of air monitoring results for the time period 1994, 1997 and 1999 which was prepared by or in the custody of Texaco's counsel.[53]  Mr. Spencer testified that the data he relied upon and contained in this spreadsheet was actually prepared by selecting data from a much larger spreadsheet of data.[54]  This larger spreadsheet has not been produced, nor has the underlying test data for the summaries. Mr. Spencer testified that the original analytical data for the 256 samples he relied upon were not available and therefore he did not review them.[55]

The documents relied upon by Mr. Spencer are inadmissible as hearsay under Federal Rules of Evidence. The Federal Rules of Evidence provide that "Hearsay is not admissible except as provided by these rules…"[56] Hearsay is defined as:

> a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.[57]

Through its witnesses, documents and experts, TDPI seeks to introduce summaries of information that would have been contained in original analytical laboratory results, lab notes, and quality control data. TDPI has produced spreadsheet summaries of laboratory data, as well as memorandum which allegedly states measured air concentration of benzene based on analytical testing. The documents produced and relied upon by TDPI claim to summarize the original laboratory data. However, TDPI has not produced the original laboratory reports and analytical data,

---

[53] Supplemental Report Mr. Spencer,  page 4, **Exhibit 12**; Deposition John Spencer (12/17/20130) at 70- 71, **Exhibit 6.**
[54] Deposition John Spencer (12/17/20130) at 70- 72**, Exhibit 6.**
[55] Id.
[56] Fed. R. Evid. 802.
[57] Fed. R. Evid. 801(c).

nor has it produced anyone who can testify to the contents of the original documents. The information in the summaries produced by TDPI is hearsay, and does not meet the requirement to be admissible evidence.

> **Federal Rule of Evidence 1006 limits the use of summaries as evidence:**
> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, **shall be made available for examination or copying, or both, by other parties at reasonable time and place.** The court may order that they be produced in court.[58]

Without the original laboratory data, no evaluation of the reliability of the summaries is possible.

The purpose of Rule 1006 is to permit the presentation of "voluminous writings, recordings, or photographs which cannot conveniently be examined in court" in the form of a chart, summary, or calculation.[59] The rationale behind the rule is to offer "the only practicable means of making their contents available to judge and jury." **The proponent of a summary must establish a foundation that "(1) the underlying materials upon which the summary is based are admissible in evidence; and (2) the underlying documents were made available to the opposing party for inspection."[60]** Where the proponent of the summary has failed to meet these requirements, the document is inadmissible.[61]

The Court in *US v. Bray* offers the clearest guidance on what is required for summary evidence to be admissible:

> First, the documents (or recordings or photographs) must be so "voluminous" that they "cannot conveniently be examined in court" by the trier of fact. That is, the documents must be sufficiently numerous as to make comprehension "difficult and … inconvenient." [62]
> Second, the proponent of the summary must also have made the documents

---

[58] Fed. R. Evid. 1006
[59] *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1259 (9th Cir. 1984) citing Fed. Rule Evid. 1006.
[60] *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1259 (9th Cir. 1984) *See also United States v. Johnson,* 594 F.2d 1253, 1254-57 (9th Cir.), *cert. denied,* 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 376 (1979).
[61] Id.
[62] *U.S. v. Bray,* 139 F.3d 1104, 1109 49 Fed. R. Evid. Serv. 33 (1998) citing *United States v. Seelig,* 622 F.2d 207, 214 (6th Cir.1980); *see Martin v. Funtime, Inc.,* 963 F.2d 110, 115 (6th Cir.1992).

"available for examination or copying, or both, by other parties at [a] reasonable time and place."[63]

Third, and relatedly, " '[c]ommentators and other courts have agreed that Rule 1006 requires that the proponent of the summary establish that the underlying documents are admissible in evidence.' "[64]

Fourth, reasonably enough, a summary document "must be accurate and nonprejudicial." *Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.,* 803 F.2d 250, 257 (6th Cir.1986). This means first that the information on the document summarizes the information contained in the underlying documents **accurately, correctly, and in a nonmisleading manner**. Nothing should be lost in the translation. It also means, with respect to summaries admitted in lieu of the underlying documents, that the information on the summary is not embellished by or annotated with the conclusions of or inferences drawn by the proponent, whether in the form of labels, captions, highlighting techniques, or otherwise. [65]

Applying the facts of this case to the factors listed by the court:

1) TDPI had made no showing that the un-produced documents are so voluminous as to necessitate the use of a summary, and without providing the original documents, they cannot make such a showing.

2) TDPI has not produced the original data which is purported to be summarized.

3) TDPI has not established that the underlying evidence would be admissible.

4) Without showing the content of the original document, it is not possible for TDPI to demonstrate that the summaries present the evidence accurately and in a non-prejudicial manner.

5) TDPI has not offered or even identified a witness who may lay the proper foundation for these summaries.

Court have held the provisions of Rule 1006 permitting the use of summaries are not to be

---

[63] *U.S. v. Bray*, 139 F.3d 1104, 1109 49 Fed. R. Evid. Serv. 33 (1998) citing Fed. R. Evid. 1006,

[64] *U.S. v. Bray*, 139 F.3d 1104, 1109-110 (1998) citing *Martin,* 963 F.2d at 116 (emphasis omitted) (quoting *United States v. Johnson,* 594 F.2d 1253, 1256 (9th Cir.1979)).

[65] *U.S. v. Bray*, 139 F.3d 1104, 1109-110 (1998)

construed as end run around evidentiary rules.[66]  A proponent of a summary **must demonstrate that the underlying records are accurate and would be admissible as evidence**.[67]  The Supreme Court held: ". . . when summaries are used . . . the **court must ascertain with certainty that they are based upon and fairly represent competent evidence already before the jury** . . . .**[68]**

> In another case, the Second Circuit held that a chart submitted by a party:

> is a very persuasive and powerful tool and must be fairly used, since, by its arrangement and use, it is an argument to the jury during the course of the trial. A chart which for any reason presents an unfair picture can be a potent weapon **for harm, and permitting the jury to consider it is error**.[69]

In *Davis & Cox v. Summa Corp.* summaries offered by a party were excluded where the proponent failed to make the underlying documents available to the opposing party.[70]  Additionally, the court excluded a compilation where it did not "fairly represent the underlying documents."[71]

Numerous Federal Courts have held that a summary or a chart must be "based on foundation testimony connecting it with the underlying evidence summarized" and must be "based upon and fairly represent competent evidence already before the jury,"[72]  Unless these requirements

---

[66] *United States v. Oros,* 578 F.3d 703, 708 (7th Cir. 2009) citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 382 (7th Cir.2008);

[67] *Id.*

[68] *United States v. Conlin,* 551 F.2d 534, 538-39 (2d Cir. 1977) citing *Gordon v. United States,* 438 F.2d 858, 876 (5th Cir. 1971), cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971).(emphasis added)

[69] *Id.* citing *Steele v. United States,* 222 F.2d 628, 630 (5th Cir. 1955), cert. denied, 355 U.S. 828, 78 S.Ct. 39, 2 L.Ed.2d 41 (1957); see also, Holland v. United States, 348 U.S. 121, 127-28, 75 S.Ct. 127, 99 L.Ed. 150 (1954). (emphasis added).

[70] *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1516 (9th Cir. 1985); see also *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1259 (9th Cir. 1984) *See also United States v. Johnson,* 594 F.2d 1253, 1254-57 (9th Cir.), *cert. denied,* 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 376 (1979).

[71] *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1516 (9th Cir. 1985)

[72] *Fagiola v. Nat'l Gypsum Co. AC & S., Inc.,* 906 F.2d 53, 57 (2d Cir. 1990), see also *United States v. Conlin,* 551 F.2d 534, 538 (2d Cir.) (quoting *Gordon v. United States,* 438 F.2d 858, 876 (5th Cir.), cert. denied, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971)), cert. denied, 434 U.S. 831, 98 S.Ct. 114, 54 L.Ed.2d 91 (1977); *United States v. O'Connor,* 237 F.2d 466, 475 (2d Cir.1956); see *United States v. Price,* 722 F.2d 88, 91 (5th Cir.1983); *United States v. Keltner,* 675 F.2d 602, 606 (4th Cir.), cert. denied, 459 U.S. 832, 103 S.Ct. 71, 74 L.Ed.2d 71

are met, a summary or chart is more likely to confuse or mislead the jury than it is to assist it.[73]

The Tenth circuit found that where a proposed summary contains or summarizes evidence not in the record, "it loses its identity as a summary and is not admissible"[74] The Third Circuit held "where access to the primary sources from which a summary is prepared is not available to an adverse party for the purpose of cross-examination to test the accuracy of the summarized information, or where the summary, in the nature of secondary evidence, is not derived from other competent supporting proofs in the case, the admission thereof may, in particular circumstances, constitute prejudicial error."[75]

Without the original laboratory reports, admission of these summaries into evidence is improper, because no independent review or determination of the accuracy is possible. Furthermore, without the original laboratory data, there is no proof that the information is sufficiently voluminous to permit the use of summaries.

Mr. Spencer's reliance on data summaries, without the original data, the description of the data collection method and circumstances is inconsistent with a reliable scientific methodology. Experts in the field of Industrial Hygiene would not relay on such unverified and unsupported data in formulating opinions concerning exposure.

**D. Reliance on unverified opinions and speculations as to what might have been done is not the type of data scientific experts reasonably rely upon in formulating their opinions.**

Mr. Spencer relies on Ronald Richard's opinions of his predecessor Allan Dooley. Ronald Richard offers testimony as to what Texaco's former Manager of Industrial Hygiene and Toxicology

---

(1982); *United States v. Conlin,* 551 F.2d 534, 538-39 (2d Cir.), cert. denied, 434 U.S. 831, 98 S.Ct. 114, 54 L.Ed.2d 91 (1977).
[73] *United States v. Citron,* 783 F.2d 307, 316-17 (2d Cir. 1986); Fed. R. Evid. Rule 403.
[74] *Oertle v. United States,* 370 F.2d 719, 728 (10th Cir. 1966)
[75] *United States v. Willis,* 322 F.2d 548, 551 (3d Cir. 1963) citing *United States v. Ward,* 169 F.2d 460 (3rd Cir. 1948); *United States v. Michener,* 152 F.2d 880 (3rd Cir. 1945) (emphasis added).

have done.[76] Ronald Richard offers testimony on what Mr. Dooley would have thought and how he believed Mr. Dooley would have acted and his conclusion that Mr. Dooley must have made sure there were no exposures to employees.   Mr. Spencer's reliance on this testimony is absurd.   Mr. Richard speculation on what Mr. Dooley thought or did 40 years ago is sheer speculation--- and neither Mr. Richard nor TDPI offers any documents to demonstrate the truth of this testimony.

This is not the type of information an expert in the field of industrial hygiene would normally rely upon.   Experts in the field of industrial hygiene—or any scientific field – would not relay on second hand opinions of what someone may have done or thought 40 years ago as a basis for  developing a scientific opinion.   Any opinions based on this hearsay and speculation offered through Mr. Richard testimony should be excluded.

### E.   Claims  that modeling and air monitoring yield significant discrepancies

Mr. Spencer claims "I have authored or co-authored several papers focused on validating calculated, modeled assessments (Plisko and Spencer 2008; Spencer and Plisko 2007; Nicas, et al. 2006).[77] The findings reported in those publications clearly noted extreme variations in modeled outcomes when compared to actual sampling results.

Apparently this not only overstates Mr. Spencer's continuations to at least one of these studies, but also appears to disagree with the published results of these studies which in fact find relatively close agreement between  modeled and actual results according to Dr. Nicas' review of these studies. [78]

### F.  Criticism that Dr. Nicas failed to validate his results

The only true validation would be actual air monitoring, in conditions identical to those Mr. Cologne experienced.   Comparison with the studies cited by Mr. Spencer, or the air monitoring

---

[76] Report John Spencer, page 4-5, **Exhibit 2**
[77] Report John Spencer, page 4-5, **Exhibit 2**
[78] Report Dr. Nicas, Page 5 (5/13/2013), **Exhibit 7**

results which have already been shown to be unreliable summary data obtained during automatic gauging ) unlike the manual gauging done by Mr. Temple, would not have been useful.

According to Mr. Spencer's testimony, he went out to the Paradis filed, and had the opportunity to perform air monitoring – but chose not to do so. [79]

### G.  Criticism of Dr. Nicas' air speed estimate

Mr. Spencer has criticized Dr. Nicas' estimate of air speed.  Dr. Nicas  used an air speed of 5 mph which  was provided by the data in Keener 1999, *Exposure and Health Risk Potential Posed to Petroleum Storage Tank Cleaners by Volatile Organic Compounds*, Environ Engg and Policy 1 (1999) 235-248 (1999).[80]   For the Monte Carlo analysis Dr. Nicas performed in his supplemental report he used the wind speeds listed on the Texaco sampling sheets produced in discovery.[81]

### Conclusion

For the reasons explained above, Mr. John Spencer's opinions are not based on a reliable scientific methodology.  Mr. Spencer ignores the evidence on the record and instead substitutes his own opinions for the evidence, relies on dissimilar sampling results, unreliable summaries,  and selectively picked data in order to report lower benzene measurements than actually existed for the type and nature of work Mr. Cologne performed.  For these reasons, Plaintiffs' respectfully request this Honorable Court grant Plaintiff's Motion to exclude the testimony and opinions of Mr. John Spencer.

Respectfully submitted,

s/Amber E. Cisney

---

[79] Deposition John Spencer (12/17/2013) at 93, **Exhibit 6**
[80] Report Dr. Nicas, Page 5 (5/13/2013), **Exhibit 7;** Keener 1999, *Exposure and Health Risk Potential Posed to Petroleum Storage Tank Cleaners by Volatile Organic Compounds*, Environ Engg and Policy 1 (1999) 235-248 (1999)., **Exhibit 12**
[81] Supplemental Report Dr. Nicas (10/29/2013), **Exhibit 7**

RICHARD J. FERNANDEZ, LSBN 05532
AMBER E. CISNEY, LSBN 28821
**LAW OFFICE OF RICHARD J. FERNANDEZ, LLC**
3000 West Esplanade Avenue, Suite 200
Metairie, Louisiana  70002
Telephone: (504) 834-8500
Facsimile: (504) 834-2609

L. ERIC WILLIAMS, JR., LSBN 26773
**WILLIAMS LAW OFFICE, LLC**
433 Metairie Rd., Suite 200
Metairie, Louisiana  70005
Telephone: (504) 832-9898
Facsimile:   (504) 832-9811

John A. Venezia (#23963)
Venezia & Associates (APLC)
757 St. Charles Avenue, Suite 303
New Orleans, Louisiana 70130
Telephone: (504) 486-3910
Facsimile: (504) 486-3913
john@venezialaw.net
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading has been served on all known counsel of record in this proceeding via electronic filing, on this 20th day of December, 2013.

*/s/  Amber E. Cisney*