COLOGNE-TDI-SPENCER-000001

 **EPI**

8805 Columbia 100 Pkwy
Columbia, MD 21045

(410) 744-0700
FAX (410) 744-2003

www.episervices.com

17 June 2013

Exhibit 2

Patrick A. Talley, Jr., Esq.
Phelps Dunbar, LLP
365 Canal Street
Suite 2000
New Orleans, Louisiana  70130-6534

Re:    **Chris and Catherine Cologne v. Shell Oil Company, et al.**
       **EPI Project No. 213274**
       **Summary Report**

Dear Mr. Talley:

This summary report has been prepared at your request as a synopsis of my opinions regarding Mr. Cologne's alleged exposure to benzene from crude oil as a result of working as a roustabout, relief pumper, and pumper in various Louisiana oilfields for Texaco between 1970 and 1976 (Complaint).  According to the complaint, as a direct and proximate result of Mr. Cologne's exposure to benzene and crude oil, Mr. Cologne developed non-Hodgkin's lymphoma.

I have been an industrial hygienist for more than 36 years.  Currently, I am President of Environmental Profiles, Inc. in Baltimore, Maryland.  Formerly, I was with the National Institute for Occupational Safety and Health and led a group of industrial hygienists conducting research for the National Occupational Exposure Survey.  As an industrial hygienist for the United States Coast Guard, I conducted numerous exposure assessments of a wide range of products, including many benzene-containing materials.  My responsibilities also included the management of the occupational medical monitoring program for the 5th Coast Guard District.  I was President of the Chesapeake Section of the American Industrial Hygiene Association (AIHA) and was a member of the national AIHA Product Health and Safety Committee and the Emergency Response Planning Committee.  I have also authored the *Health and Safety Audits Manual*, published by Government Institutes, and the *AIHA Hazard Communication Guide*, published by the AIHA.  I have published several articles in peer-reviewed journals on airborne exposure modeling and assessment.  In these papers, I have discussed the value and limitations of exposure assessment models.

The American Board of Industrial Hygiene certifies me as an industrial hygienist and the Board of Certified Safety Professionals certifies me as a safety professional.  A copy of my curriculum vitae is included as Attachment 1, and a list of my deposition and trial testimony from the past four years is included as Attachment 2.  Environmental Profiles, Inc. charges $295 per hour plus expenses for my time in preparation and testimony in this matter.

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 2

**Employee Work History**

Information regarding Mr. Cologne's work history was obtained from his deposition, affidavit, social security records, and Texaco employment records. Mr. Chris Cologne graduated from high school in 1960 and then worked for Brown & Root intermittently between the second quarter of 1960 and the third quarter of (Deposition of Chris Cologne, page 22; Social Security records). During this time he worked at different drilling fields and laid down boards for drilling and work-over locations, stretched out pipe and dug ditches, did some painting, and ran and repaired flow lines (Deposition of Chris Cologne, page 24-31). Mr. Cologne denied working with crude oil or gasoline products (Deposition of Chris Cologne, page 28).

Between the third quarter of 1962 and the second quarter of 1970, Mr. Cologne worked as a tack welder for Avondale Shipyards (Deposition of Chris Cologne, page 33-34; Social Security records). During that time he worked with a ship fitter and the ship fitter held pieces in place as he tack welded products (Deposition of Chris Cologne, page 34). Mr. Cologne denied working as a painter at this location and did not work with solvents or having any exposure to paint vapors products (Deposition of Chris Cologne, page 34-35). While working as a tack welder, Mr. Cologne did not use gloves or respiratory protection (Deposition of Chris Cologne, page 36).

Mr. Cologne testified that he worked for Texaco from 6 April 1970 through 1 April 1999 (Deposition of Chris Cologne, page 28). These dates were corroborated with his Texaco employment records. According to Mr. Cologne's Texaco employment records, Mr. Cologne began employment with Texaco on 6 April 1970 as a temporary roustabout (CologneTdpi000011) and this roustabout employment became permanent on 16 August 1970 (CologneTdpi000018). Beginning on 16 March 1977, Mr. Cologne was temporarily promoted to fill a vacancy in the pumping forces at Paradis Field due to the extended illness of Mr. Clifford Breaux (CologneTdpi000023). Mr. Cologne's temporary pumper status was made permanent on 1 November 1978 (CologneTdpi000032). Mr. Cologne continued his employment with Texaco through approximately 1 April 1999 (CologneTdpi000106) and worked in various capacities including pumper, compressor operator, compressor mechanic, and operations specialist (CologneTdpi000001- CologneTdpi000002).

Mr. Cologne testified that between 1970 and 1976 he spent most of his time working in the Paradis field, located in Louisiana (Deposition of Chris Cologne, page 53). During this time he typically worked eight hours per day and 40 hours per week (Deposition of Chris Cologne, page 127). The Paradis field had seven tank batteries and some of the tank batteries had compressor stations, glycol dehydrators, and disposal wells (Deposition of Chris Cologne, page 58). The wells in the Paradis field brought the oil and gas out of the ground and the material was piped to a separator which separated the crude oil and gas (Deposition of Chris Cologne, page 59). The crude oil was piped to a treater which separated the oil from the water and the crude oil was piped to crude oil tanks and the water was piped to saltwater tanks (Deposition of Chris Cologne, page 60).

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 3

According to Mr. Cologne, between 1970 and 1975 he was classified as a roustabout, but during that time he also performed the work as a relief pumper (Deposition of Chris Cologne, page 68). He worked as a relief pumper when others went on vacation (Deposition of Chris Cologne, page 71).

When working as a roustabout, Mr. Cologne was involved in repairing flow line leaks and pumps, including circulating pumps, saltwater pumps, pumps on treaters, and "flow co impellers" (Deposition of Chris Cologne, page 77). He also ran flow lines, set-up chemical drums, hooked-up chemicals pumps, picked up pollution in the marsh, and cleaned tank batteries (Deposition of Chris Cologne, page 82). He characterized this work as maintenance work (Deposition of Chris Cologne, page 78).

Mr. Cologne testified that he was classified as a roustabout between 1970 and 1975. However, he stated that he worked as a relief pumper for three months each year between 1970 and 1972 (Affidavit of Chris Cologne), was a fill-in pumper in 1973 and 1974 when coworkers became ill (Deposition of Chris Cologne, page 93; Affidavit of Chris Cologne), and then became a full time pumper between 1975 and 1976 (Deposition of Chris Cologne, page 93; Affidavit of Chris Cologne). Mr. Cologne's testimony and affidavit are not consistent with his Texaco employment records. As previously stated, according to employment records, Mr. Cologne became a permanent roustabout on 16 August 1970 (CologneTdpi000018) and it was not until 16 March 1977 when Mr. Cologne was temporarily promoted to fill a vacancy in the pumping forces at Paradis Field due to the extended illness of Mr. Clifford Breaux (CologneTdpi000023). Mr. Cologne's temporary pumper status was made permanent on 1 November 1978 (CologneTdpi000032).

According to Mr. Cologne, a pumper gauged crude and saltwater tanks, wells, and treaters (Deposition of Chris Cologne, page 88). The tanks were gauged by lowering a weighted measuring tape into the tank and measuring the level of product and water (Deposition of Chris Cologne, page 86). In addition to gauging the tanks, they also had to sample the oil and determine the gravity of the oil and the salinity of the saltwater (Deposition of Chris Cologne, page 85).

Mr. Cologne testified that tanks were gauged every day and the wells were gauged at least every two weeks (Deposition of Chris Cologne, page 88-89). He typically gauged 15 tanks per day and that it took approximately 10 minutes to gauge each tank (Affidavit of Chris Cologne). Mr. Cologne testified that he did not wear respiratory protection or gloves when gauging tanks (Deposition of Chris Cologne, page 105).

According to Mr. Cologne, the safety program at Texaco consisted of mostly first aid (Deposition of Chris Cologne, page 94). He acknowledged that they did have safety meetings once per month and noted that they did discuss how to do things safer, but they mainly dealt with maintenance issues (Deposition of Chris Cologne, pages 94; 98). Mr. Cologne denied that any

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 4

air monitoring for benzene was conducted and he did not recall any blood or urine tests (Deposition of Chris Cologne, page 95).

Mr. Cologne testified that Texaco provided him with hip boots, a hard hat, and a pair of goggles (Deposition of Chris Cologne, page 96). He did not recall gloves or respiratory protection being available to him (Deposition of Chris Cologne, page 104).

**Texaco Occupational Benzene Sampling in Oil and Gas Production Areas**

Ronald Richards began working as an industrial hygienist for Texaco in July 1969 (20 May 2009 Deposition of Ronald Richards, page 12) and in 1971 became the Manager of Industrial Hygiene and Toxicology (20 May 2009 Deposition of Ronald Richards, page 13). Mr. Richards acknowledged that it was Texaco's responsibility to assure that employees were not overexposed to benzene (20 May 2009 Deposition of Ronald Richards, page 30). Sampling technology changed over time and he thought that in the 1950s and early 1960s they used detector tubes to evaluate individuals' exposures. In the latter 1960s air sampling evolved and they started using personal sampling pumps and charcoal tubes (20 May 2009 Deposition of Ronald Richards, page 24).

Mr. Richards testified that he may have collected air samples in the oilfields and noted that he had conducted numerous industrial hygiene walk-throughs in oilfields throughout the United States, including Louisiana and Texas (20 May 2009 Deposition of Ronald Richards, page 27). He thought that his first trip to an oilfield was around 1970 (20 May 2009 Deposition of Ronald Richards, page 86). Mr. Richards recalled going to the New Orleans division and visiting several gas plants and onshore and offshore oil-producing operations (20 May 2009 Deposition of Ronald Richards, page 86).

He was concerned about the health effects of crude oil and his primary concern at the producing fields was sulfuric gases (20 May 2009 Deposition of Ronald Richards, page 28). They were taking steps to alert workers about some of the sulfuric compounds becoming airborne. Additionally, they were concerned about tank cleaning procedures. Consequently, they were reviewing and making sure that employees were using the proper controls (20 May 2009 Deposition of Ronald Richards, page 28).

Mr. Richards knew that his predecessor, Allan Dooley, visited many producing fields (20 May 2009 Deposition of Ronald Richards, page 34). Mr. Dooley had an outstanding reputation in the industrial hygiene community (20 May 2009 Deposition of Ronald Richards, page 77). According to Mr. Richards (20 May 2009 Deposition of Ronald Richards, page 34):

> *I know that Allan Dooley specifically had knowledge about the hazards that were - - that people were aware of at the time, of benzene. I know that Allan did the walk-through with that knowledge in mind, and would have collected samples had*

COLOGNE-TDPI-SPENCER-000005

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 5

> *he though there was some sort of danger involved, hazard involved, or if there*
> *would have been something close to the threshold limit value in some type of*
> *exposure.*

As a result of Mr. Dooley's experience, he never expressed concerns that the oilfield workers were at any risk of harm from benzene (20 May 2009 Deposition of Ronald Richards, page 88). Mr. Richards indicated that if Mr. Dooley encountered an industrial hygiene problem, he would follow it through to the end and make sure that exposures were controlled and the employee was protected (20 May 2009 Deposition of Ronald Richards, page 89).

According to Mr. Richards, he believed that during the period between 1970 and 1976 he directed Texaco personnel to collect air samples on representative oil field workers in order to assess their exposures to benzene (20 May 2009 Deposition of Ronald Richards, page 22). At this point in time Mr. Richard did not recall the results of the sample analyses (20 May 2009 Deposition of Ronald Richards, page 24). However, during his inspections and surveys of various oilfields between 1971 and 1982 he did not believe that the oilfield workers had a risk of adverse health effects due to exposures to benzene (20 May 2009 Deposition of Ronald Richards, page 95).

Texaco has conducted a significant amount of air sampling related to benzene exposures associated with crude oil and gas producing operations. In its May 1978 comments to the U.S. Department of Labor (CologneTdpi002693-CologneTdpi002725), Texaco noted that they had collected 426 air samples from Texaco's crude oil and natural gas production operations at 39 locations around the country and the average benzene exposure was 0.0625 ppm with a range of zero to 3.0 ppm (range <0.01 ppm to 9.5 ppm). This data was not broken out in terms of tasks, location, or specific product (crude v. natural gas). Additionally, Texaco collected 332 bulk samples of crude oil from all over the country and reported that the average volume percentage of benzene was 0.21%.

Texaco conducted air sampling for benzene in October and November 1977 in a Texas oil field in the breathing zone of pumpers, roustabouts, and plant operators (CologneTdpi001739-CologneTdpi001740). Specific details regarding the tasks and products for each individual sample results were not available. However, Texaco employee, Herschel Hobson, reported in a memorandum dated 3 January 1978 (CologneTdpi001739-CologneTdpi001740) that the benzene concentration of a total of 16 samples collected over a 383 to 494 minute period ranged from <0.01 ppm to 0.2 ppm.

Additional benzene air sampling was conducted by Texaco in Texas oil fields in 1978 and 1979 on pumpers and roustabouts as follows:

- May 1978 (CologneTdpi001741-CologneTdpi001743)
- January 1979 (CologneTdpi001791-CologneTdpi001793)

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 6

- February-March 1978 (CologneTdpi001796-CologneTdpi001799)
- 10 March 1978 (CologneTdpi001800-CologneTdpi001802)
- 22 March 1978 (CologneTdpi001803-CologneTdpi001804)
- February-March 1978 (CologneTdpi001805-CologneTdpi001808)
- April-May 1978 (CologneTdpi001809-CologneTdpi001811)
- June-July 1978 (CologneTdpi0011812-CologneTdpi001813)
- September-October 1978 (CologneTdpi001814-CologneTdpi001817)
- September 1978 (CologneTdpi001818-CologneTdpi001819)
- October 1978 (CologneTdpi001820-CologneTdpi001822)
- April and June 1978 (CologneTdpi001831)

During the 1978-1979 period there were a total of 50 long term air samples and 53 short term air samples collected for benzene on pumpers and 17 long term air samples and 18 short term air samples collected for benzene on roustabouts that included work activities involving crude oil and gas condensate. Air samples were collected on 600 mg SKC charcoal tubes with personal sampling pumps and were subsequently analyzed with gas chromatography by an accredited industrial hygiene laboratory. Overall, based on available testimony and Texaco documents, specifically during Mr. Cologne's Texaco work history between 1970 and 1977, the company used industrial hygiene practices and sampling techniques that corresponded with the knowledge and technology of the time in order to quantify occupational exposures. Table 1 contains a summary of this data:

**Table 1: 1978-1979 Texaco Benzene Air Sampling Data Summary for Pumpers and Roustabouts**

| Job | Number of Samples | Mean (ppm) | Range (ppm) |
|---|---|---|---|
| Pumper (long term samples) | 50 | 0.08 | <0.01-2.2 |
| Pumper (short term samples) | 53 | 0.62 | <0.01-9.5 |
| Roustabout (long term samples) | 17 | 0.13 | <0.01-2.0 |
| Roustabout (short term samples | 18 | 0.06 | <0.01-0.45 |

In an effort to understand exposures associated with the gauging of tanks I have also looked at available personal sampling data during the gauging of tanks/barges containing crude oil. Moen, et al. (1995a) evaluated benzene exposures during various activities aboard crude oil tankers. The benzene content was not reported. Four long term samples were collected for benzene during manual tank gauging and the 8-hour time-weighted average concentrations ranged from 0.01 to 0.09 with an average of 0.038 ppm. In a similar evaluation, Moen, et al. (1995b) also provided a short term sample (10 minute) result and a long term sample (193) result during the manual gauging on a crude oil tanker. The benzene content was not reported. The short term benzene concentration was 1.15 ppm and the long term benzene concentration was 0.21 ppm. This gauging data is consistent with the Texaco data summarized above.

COLOGNE-TDI-SPENCER-000007

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 7

## Regulatory and Guidance Information on Benzene

The knowledge of the health hazards of benzene and other solvent constituents have evolved over time. In 1974 the National Institute for Occupational Safety and Health published a criteria document on benzene (NIOSH 1974). At that time the NIOSH reported on some studies suggesting a relationship between benzene exposures and leukemia. It was not until 1976 when NIOSH published their *Revised Recommendation for an Occupational Exposure Standard for Benzene* (NIOSH 1976) where they reported on the results of several epidemiologic studies and noted that the "*accumulated evidence from clinical as well as from epidemiological data to be conclusive at this time that benzene is leukemogenic.*" In response to this information OSHA issued an emergency temporary standard, reducing occupational exposures to 1 ppm in 1977.

Information on the potential hazards of benzene was available to the rubber, petroleum, and chemical industries through several industry, governmental, and standards organizations since the 1940s. Such organizations included the American Standards Association (predecessor to the American National Standards Institute (ANSI)), the Manufacturing Chemists' Association (MCA), The American Conference of Governmental Industrial Hygienists (ACGIH), and the American Petroleum Institute (API). The available information included recommended occupational exposure limits, chemical safety data sheets, and chemical hazard placards required by the U.S. Coast Guard for water transportation of benzene. Such information was used by the rubber, chemical, and petroleum industry to develop guidelines for safe chemical handling and worker protection (API 1948; MCA 1960; AIHA; 1961; ANSI 1969; NIOSH 1974; NIOSH 1976).

Prior to the formation of the Occupational Safety and Health Administration (OSHA) and promulgation of its initial regulations in 1971, the American Conference of Governmental Industrial Hygienists (ACGIH) had established a Threshold Limit Value (TLV) for benzene. The TLV "…refers to airborne concentration of chemical substances and represents conditions under which it is believed that nearly all workers may be repeatedly exposed, day after day, over a working lifetime, without adverse health effects" (ACGIH 2004). Between its initiation in 1946 and 1956, the benzene 8-hour time weighted average (TWA) TLV was reduced from 100 ppm in 1946 to 50 ppm in 1947, to 35 ppm between 1948 and 1956, and to 25 ppm between 1957 and 1962. Between 1963 and 1976 benzene TLV was changed from a 25 ppm 8-hour TWA TLV to a 25 ppm ceiling TLV. Since 1976 the TLV has been reduced to 10 ppm as an 8-hour TWA (1977-1996) and to 0.5 ppm (1997 to the present) (ACGIH 2001). The current TLV is recommended to minimize the potential for leukemogenesis (ACGIH 2001).

In 1961 the American Industrial Hygiene Association published its Hygienic Guide Series, which included benzene (AIHA, 1961a). This Guide recommended a maximum 8-hour TWA concentration of 25 ppm based "*[p]rincipally [on] human experience in industry plus toxicological observations on animals.*"

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 8

When OSHA was formed in 1971, it adopted the American National Standards Institute (ANSI) benzene standard of 10 ppm as an 8-hour TWA with a ceiling of 25 ppm. This original standard had an acceptable 50 ppm 10-minute peak concentration. On 3 May 1977 OSHA issued an Emergency Temporary Standard (ETS) based on their determination that clinical and epidemiological data established that employee exposure to benzene presented a leukemia hazard (Federal Register 1977). This ETS limited benzene exposure to 1 ppm as an 8-hour time weighted average but excluded the use of liquid mixtures with less than 1% benzene. Based on the available data OSHA concluded that employees working with mixtures containing less than 1% benzene would have exposure of less than 1 ppm as an 8-hour time weighted average. The effective date for this standard was subsequently stayed and withdrawn by OSHA (Federal Register 1987). It was not until 1987 when OSHA reduced the 8-hour time weighted average permissible exposure limit from 10 ppm as an 8-hour TWA to 1 ppm (Federal Register 1987).

## Exposure Assessment Methodology

### General Exposure Assessment Methodology

The classic definition of industrial hygiene is the science and art related to the anticipation, recognition, evaluation, and control of hazards arising in or from the workplace. Comprehensive exposure assessment, which is a part of the industrial hygiene process, is the systematic review of the processes, practices, materials, and division of labor present in a workplace that is used to define and judge exposures (Mulhausen and Damiano 1997). In other words, an exposure assessment describes the magnitude (concentration), frequency, and duration of a person's exposure and involves the integration of the work process and environment, the work tasks, the personal protective equipment, and the chemical or physical agents. As a certified industrial hygienist, I rely upon the following basic tools in order to conduct an exposure assessment of personal occupational exposures such as those experienced by Mr. Cologne:

1. a characterization of the environment in which the exposure occurred (including room size and ventilation rate);
2. a characterization of the job and tasks conducted in that environment (including frequency and duration of exposures);
3. a characterization of the products (including volatility);
4. a review and analysis of historical exposure data collected during tasks involving the appropriate handling of the product;
5. evaluation of exposure data to determine whether accepted air sampling and analytical techniques and/or modeling were used to assess the magnitude of exposures; and,
6. a characterization of the relevant safety and health regulations and the associated exposure limits.

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 9

The industrial hygienist's training, skills, and experience qualifies him or her to direct efforts for collecting critical information for basic characterization, designating similar exposure groups, and identifying important occupational exposures (Mulhausen and Damiano 1998). Because it is difficult to measure exposures to every worker, the strategy employed by industrial hygienists is to assemble workers believed to have similar exposures into a similar exposure group (SEG). A SEG is a group of workers having the same general exposure characteristics because of similarities in frequency of the tasks they perform, the materials, and processes with which they work, and the similarity of the way in which they perform the tasks (Mulhausen and Damiano 1998).

*Exposure Assessment for Mr. Cologne*

No benzene air sampling has been identified for Mr. Cologne. However, as previously summarized, Texaco conducted a significant amount of benzene air sampling on employees with the same job title as Mr. Cologne including pumpers and roustabouts. I have spoken with Doug Mattherne, a former Texaco employee who had worked at the Paradis field during the same time frame as Mr. Cologne. He reported that the tank gauging procedures throughout the 1970 to 1980 period would have remained the same and a pumper and roustabout in Louisiana would have performed the same tasks and procedures as a roustabout or pumper in Texas. Additionally, published data on the benzene content of crude oil reported that the benzene content in Louisiana crude was similar to Texas crude (Grizzle and Coleman 1979). There were 21 crude oil samples collected from various areas of Louisiana and 26 samples of crude oil collected from various areas of Texas. The mean benzene content for Louisiana and Texas was 0.137% and 0.144% by weight, respectively.

It is clear that the benzene content of Texas and Louisiana crude oils were similar and that the pumper and roustabout job tasks and procedures in Texas and Louisiana were the same. Consequently, the benzene air sampling data collected on Texaco pumpers and roustabouts in 1978 and 1979 is representative of the potential benzene exposures encountered by Mr. Cologne while working as a roustabout and pumper in Louisiana between 1970 and 1976.

Considering the Texaco mean long term benzene exposure data for pumpers and roustabouts 0.08 ppm and 0.13 ppm, respectively and the time Mr. Cologne spent working in those capacities, his cumulative benzene exposure for the period between 1970 and 1976 can be calculated. Mr. Cologne's employment records and information regarding his job duties indicated that he did not work as a relief pumper until after 1976 and, therefore was a roustabout during that entire period. In that case his cumulative benzene exposure would have been:

- 6.75 years x 0.13 ppm = 0.88 ppm-years

Alternatively, if you rely on Mr. Cologne's testimony that he worked as a roustabout for 2.06 years and as a pumper for 4.69 years, his cumulative benzene exposure would have been:

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 10

- 2.06 years x 0.13 ppm + 4.69 years x 0.08 ppm = 0.643 ppm-years

Based on the historical air sampling data and the description of Mr. Cologne's responsibilities and tasks, it is my opinion that his overall exposure to benzene while working as a roustabout and pumper for Texaco was well below the benzene occupation health standard of the time.

## Report of Mark Nicas, PhD and of Melvyn Kopstein, PhD

According to the complaint, Mr. Cologne was exposed to technologically enhanced radioactive material (TERM), naturally occurring radioactive material (NORM), welding fumes, and benzene from crude oil and gas condensate. However, with the exception of benzene from crude oil, none of the plaintiff experts have assessed or calculated Mr. Cologne's exposures to these products. To the extent that Plaintiff experts present additional opinions regarding Mr. Cologne's exposure, I reserve the right to determine the impact, if any, of the new information on my opinions and conclusions, including the opinion and conclusions regarding Mr. Cologne's benzene exposure, and to revise my opinions or present additional opinions and conclusions if necessary.

I have reviewed Dr. Nicas's 13 May 2013 report and Dr. Kopstein's 9 May 2013 report. Dr. Kopstein obtained values for the molecular weight of crude oil, the percentage of benzene in crude oil, and the benzene activity coefficient in order to calculate the headspace concentration of benzene. Dr. Kopstein provided this information to Dr. Nicas and he used this information to model (calculate) Mr. Cologne's benzene exposure while gauging tanks.

In determining the benzene content of crude oil, Dr. Kopstein cited a Texaco crude oil Material Safety Data Sheet (MSDS) that purportedly showed that the benzene content ranged from 0.1 to 0.99%. He then took the average of these two values to arrive at a benzene concentration of 0.545%. As previously stated, there is data in the published literature that reported the benzene content in crude oil in Louisiana, Texas, and other areas in the country (Grizzle and Coleman 1979). The mean benzene content for Louisiana and Texas was 0.137% and 0.144%, respectively. In support of these values, Wang et al. (2003) reported the benzene content of crude oil from Baton Rouge, Louisiana was 0.16% by weight. IARC (1989) reported the benzene content of one crude oil sample from south Louisiana was 0.2% by weight. Even one of Dr. Kopstein's own reference McMillen, et al. (2001), indicated a much lower benzene concentration in crude oil than what was derived from his calculation. MSDS are often used to report the highest value such that the MSDS can be used internationally. The average benzene concentration of 69 crude oil samples collected worldwide was 0.134% by weight. Based on benzene content values, the typical benzene content in the Louisiana/Texas area would be approximately 0.14%. Consequently, the benzene content of crude oil that Dr. Kopstein used was overstated by a factor of approximately 3.9. Therefore, any of Dr. Nica's exposure calculations based on Dr. Kopstein's benzene content of crude oil would be reduced by a factor of 3.9.

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 11

Dr. Nicas relied upon Dr. Kopstein's values for the molecular weight of crude oil, the percentage of benzene in crude oil, and the benzene activity coefficient in order to calculate the headspace concentration of benzene. He then used the Near Field-Far Field (NF-FF) model to calculate Mr. Cologne's benzene exposure during the ten minute time period that he was gauging crude oil tanks. Depending on the size of the tank and other variables, Dr. Nicas estimated that Mr. Cologne's 10 minute time-weighted average exposure would range from 57.8 ppm to 121 ppm. Simply accounting for the fact that Dr. Nicas relied upon an inaccurate value for the benzene content of crude oil reduces his 10 minute time-weighted average exposure levels to 14.8 ppm to 30.4 ppm.

Various authors, including myself, have reported on the accuracy of the Near Field-Far Field (NF-FF) model used to estimate workplace exposure to solvent vapors under various conditions. However, I have never seen the NF-FF model applied to estimate exposures associated with ambient tank gauging in the manner used by Dr. Nicas. More importantly, Dr. Nicas made no attempt to validate the NF-FF model as applied using available air monitoring data. Validation is the required scientific methodology for supporting modeled values (AIHA 2009; Jayjock et al. 2011; EPA 2005). I have authored or co-authored several papers focused on validating calculated, modeled assessments (Plisko and Spencer 2008; Spencer and Plisko 2007; Nicas, et al. 2006). The findings reported in those publications clearly noted extreme variations in modeled outcomes when compared to actual sampling results. Such variations between modeled and actual data are the direct result of the model input variables. A change in wind speed, wind direction, or benzene content, has a very significant impact on the reported exposure level. Validating your modeled outcomes is required to have the confidence you reporting reliable data. Consequently, the exposure values generated by Dr. Nicas are not reliable.

To illustrate the importance of model validation I have compared Dr. Nicas's modeled results with Texaco's actual air monitoring data. Dr. Nicas estimated benzene 8-hour time-weighted average exposures based on the lowest modeled tank gauging exposures. His estimated benzene 8-hour time-weighted average exposures ranged from 11.6 ppm to 21.1 ppm. Comparing his modeled values to the Texaco average pumper benzene 8-hour time-weighted average exposure of 0.08 ppm shows that his modeling methodology was not reliable because it overestimated exposures by a factor of 145 to 263.

## Summary of Opinions

Based upon my review of the case-specific documents including depositions, and discovery documents, and the scientific literature I am offering the following opinions to a reasonable degree of scientific certainty:

- Overall, based on available testimony and Texaco documents, specifically during Mr. Cologne's Texaco work history between 1970 and 1976, the facility used industrial

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 12

hygiene practices and sampling techniques that corresponded with the knowledge and
technology of the time in order to quantify occupational exposures.

- Considering the mean long term benzene exposure data for Texaco pumpers and
  roustabouts collected in 1978 and 1979 and the time Mr. Cologne spent working in those
  capacities, his cumulative benzene exposure for the period between 1970 and 1976 would
  have been in the range of 0.643 ppm-years to 0.88 ppm-years.

- Based on the historical Texaco air sampling data from 1978 and 1979 and the description
  of Mr. Cologne's responsibilities and tasks, it is my opinion that his overall exposure to
  benzene while working as a roustabout and as a pumper for Texaco was well below the
  benzene occupation health standard of the time.

- Dr. Kopstein failed to rely on the relevant literature when concluding that that average
  benzene content of crude oil was 0.545%. Based on benzene content values in the
  literature, the typical benzene content in the Louisiana/Texas area would be
  approximately 0.14%. Consequently, the benzene content of crude oil that Dr. Kopstein
  relied upon was overstated by a factor of approximately 3.9. Therefore, any exposures
  calculations based on Dr. Kopstein's benzene content of crude oil would be reduced by a
  factor of 3.9.

- Dr. Nicas used the NF-FF model to estimate Mr. Cologne's benzene exposure during the
  ten minute time period that he was gauging crude oil tanks. Dr. Nicas made no attempt to
  validate the NF-FF model as applied using available air monitoring data. Comparing his
  modeled values to the Texaco average pumper benzene 8-hour time-weighted average
  exposure of 0.08 ppm shows that his modeling methodology not reliable because it
  overestimated exposures by a factor of 145 to 263. Consequently, the exposure values
  generated by Dr. Nicas are not reliable.

My opinions are to a reasonable degree of scientific certainty and are based on my more than 36
years of experience as an industrial hygienist and safety professional. My experience has
included health hazard evaluations and audits of multiple operations within facilities similar to
those where Mr. Cologne was employed. My experience has also included the development of
exposure assessment strategies, training of employees who worked in numerous industrial
operations, my prior work as a member of the AIHA's Product Safety and Health Committee,
and my current membership in the Society for Chemical Hazard Communication. I also base my
opinions upon portions of the scientific literature focused on hazard communication and
occupational health hazard assessment.

For purposes of this report, I have reviewed numerous documents, articles, studies and
publications, which include but are not limited to the following:

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 13

1.   Complaint.

2.   Plaintiffs' Responses to Texaco Downstream Properties, Inc.'s First Set of Interrogatories
     and Requests for Product of Documents.

3.   Plaintiffs' Supplemental Responses to Texaco Downstream Properties, Inc.'s First Set of
     Interrogatories and Requests for Product of Documents.

4.   Deposition of Chris Cologne, dated 11 April 2013.

5.   Affidavit of Chris Cologne, dated 9 May 2013.

6.   Texaco Production Documents (CologneTdpi000305-CologneTdpi002991).

7.   Cologne Texaco Employee File (CologneTdpi000001-CologneTdpi000304).

8.   Mark Nicas, PhD, CIH Expert Report, dated 13 May 2013.

9.   Melvyn Kopstein, PhD Expert Report, dated 9 May 2013.

10.  Deposition of Ronald Richards in Frauenberger v. Texaco, taken 20 May 2009.

11.  Agency for Toxic Substances and Disease Registry (ATSDR). 2008. *Toxicological
     Profile for Benzene*.

12.  American Conference of Governmental Industrial Hygienists (ACGIH). 2001.
     *Documentation of the Threshold Limit Value and Biological Exposure Indices*.
     Cincinnati, Ohio: ACGIH.

13.  American Conference of Governmental Industrial Hygienists (ACGIH). 2007. *2007
     TLVs and BEIs Based on the Documentation of the Threshold Limit Values for Chemical
     Substances and Physical Agents & Biological Exposure Indices*. ACGIH: Cincinnati,
     OH.

14.  American Industrial Hygiene Association (AIHA). 1961. *Hygienic Guide Series
     Benzene*. December 1961.

15.  American Industrial Hygiene Association (AIHA). 2009. *Mathematical Models for
     Estimating Occupational Exposure to Chemicals*. Keil, Simmons, Anthony, Eds. Second
     Edition.

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 14

16.    American National Standards Institute (ANSI). 1969. *USA Standard Acceptable Concentrations of Benzene*. Z37.4-1969.

17.    American Petroleum Institute (API). 1948. *API Toxicological Review, Benzene*. September 1948, American Petroleum Institute.

18.    Brief, Richard S., et al. 1980. "Benzene in the Workplace," *American Industrial Hygiene Association Journal*. 41:616-623.

19.    Code of Federal Regulations, 29 CFR Part 1910.

20.    Environmental Protection Agency (EPA). 2005. Appendix W to Part 51 – Guideline on Air Quality Models.

21.    Federal Register. 34460-34578. Department of Labor, Occupational Safety and Health Administration. 29 CFR Part 1910. Occupational Exposure to Benzene; Final Rule. 11 September 1987.

22.    Grizzle, P.L. and Coleman, H.J. 1979. "Gas Chromatographic Determination of Benzene and Toluene in Crude Oils." *Analytical Chemistry*. 51:602-608.

23.    International Agency for Research on Cancer (IARC). 1989. *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Occupational Exposure in Petroleum Refining; Crude Oil and Major Petroleum Fuels*. Volume 45. IARC, Lyon, France.

24.    Ignacio, J.S. and Bullock, W.H. 2006. *A Strategy for Assessing and Managing Occupational Exposures*. AIHA Press, Fairfax, VA, Third Ed.

25.    Jayjock, M.A., Armstrong, T., Taylor, M. 2011. "The Daubert Standard as Applied to Exposure Assessment Modeling Using the Two-Zone (NF/FF) Model Estimation of Indoor Air Breathing Zone Concentration as an example." *Journal of Occupational and Environmental Hygiene*. 8:D114-D122.

26.    Manufacturing Chemists Association (MCA). 1960. *Chemical Safety data Sheet SD-2, Properties and Essential Information for Safe Handling and Use of Benzene*. MCA: Washington, DC.

27.    McMillen, S.J., Magaw, R.I., Carovillano, R.L. 2001. *Risk-Based Decision-Making for Assessing Petroleum Impacts at Exploration and Production Sites*.

Chris and Catherine Cologne v. Shell Oil Company, et al.
Summary Report
EPI Project No. 213274
Page 15

28.   Moen, B.E., Hollund, B.E., Berntsen, M., Flo, R., Kyvik, K.R., Rilse, T.  1995a.
      "Occupational Exposure of Deck Crews to Carcinogenic Agents on Crude Oil Tankers."
      *American Journal of Industrial Medicine*.  27:555-564.

29.   Moen, B.E., Hollund, B.E., Berntsen, M., Flo, R., Kyvik, K.R., Rilse, T.  1995b.
      "Exposure of the Deck Crew to Carcinogenic Agents on Oil Product Tankers."  *Annals of
      Occupational Hygiene*.  3:347-361.

30.   Mulhausen, John R., and Joseph Damiano.  1998.  *A Strategy for Assessing and
      Managing Occupational Exposures*.  AIHA, Fairfax, VA, Second Ed.

31.   National Institute for Occupational Safety and Health (NIOSH).  1974 and 1976.
      *Criteria for a Recommended Standard, Benzene*.

32.   Nicas, Mark, Plisko, M.J., Spencer, J.W.  2006.  "Estimating Benzene Exposure at a
      Solvent Parts Washer."  *Journal of Occupational and Environmental Hygiene*. 3:284-
      291.

33.   Plisko, Marc J. and Spencer, J.W.  2008.  "Evaluation of a Mathematical Model for
      Estimating Solvent Exposure in the Workplace."  *Journal of Chemical Health and Safety*.
      15:14-21.

34.   Spencer, John W., Plisko, M.J.  2007.  "A Validation Study of a Mathematical Model for
      Estimating Solvent Exposures During the Disassembly of Metal Parts."  *Journal of
      Occupational and Environmental Hygiene*.  4:253-259.

35.   Wang, Z., Hollebone, B.P., Fingas, M., Fieldhouse, B., Sigouin, L., Landriault, M.,
      Smith, P., Noonan, J., Thouin, G.  2005.  *Characteristics of Spilled Oils, Fuels, and
      Petroleum Products:  1. Composition and Properties of Selected Oils*.  U.S. EPA, July
      2003.  EPA/600/R-03/072.

COLOGNE-FDPI-SPENCER-000016

**Chris and Catherine Cologne v. Shell Oil Company, et al.**
**Summary Report**
**EPI Project No. 213274**
**Page 16**

This report is based on the information available to me at this time.  Should additional information become available, I reserve the right to determine the impact, if any, of the new information on my opinions and conclusions, including the opinion and conclusions regarding Mr. Cologne's benzene exposure, and to revise my opinions and conclusions if necessary.

Sincerely,

John W. Spencer, CIH, CSP
President

JWS/mln