UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

_____

CHRIS COLOGNE, ET AL.,

       Plaintiffs,

vs.                          CIVIL ACTION NO.:  12-735

SHELL OIL COMPANY, ET AL.,

       Defendants.
_____

Exhibit 6

VIDEOTAPED DEPOSITION OF

# JOHN SPENCER

ROUGH DRAFT

TUESDAY, DECEMBER 17, 2013

9:15 A.M.

BEST WESTERN PLUS COASTLINE INN

503 NUTT STREET

WILMINGTON, NORTH CAROLINA



**National Court Reporters, Inc.**
**Serving Legal Professionals From Coast To Coast**
www.nationalcourtreporters.com     Mail@nationalcourtreporters.com
888.800.9656    Fax 866.819.2317
Great Lakes Offices
Interstate Plaza Building, Suite 170
16600 W Sprague Road
Cleveland, Ohio 44130-6318

1      A    I have not seen all of the field sampling
2  logs and data, no.
3      Q    Just so we're correct, you have not received
4  the individual analysis sheet for each sample?  Is that --
5      A    That -- that is correct.
6      Q    And would you agree with me that that
7  spreadsheet covers tasks done from 1977 to 1997?
8      A    I know it started, yes, in '77.  And I don't
9  remember when it ended.
10     Q    Okay.  In reviewing that spreadsheet, I
11 found entry -- do you have a copy with you?
12     A    Yes.
13     Q    Can you pull that out?  That would help us
14 save some time.
15     A    (Witness complies.)
16          MR. TALLEY:  Eric, you're going to have to
17     hold on and let me get that.
18          MR. WILLIAMS:  Okay.
19          MR. TALLEY:  It will just take me a couple
20     minutes.  We don't even need to go off record.
21          MR. WILLIAMS:  Okay.
22          MR. TALLEY:  I've just got to walk back --
23     okay, I'm back.
24          MR. WILLIAMS:  Okay.
25          BY MR. WILLIAMS:

1        Q    Mr. Spencer, did you locate the sheet?
2        A    Yes.
3        Q    Mr. Spencer, did you request the analytical
4    sheets for those 256 samples?
5        A    Yes.  I -- I wanted the back-up data, but
6    apparently it was not available.
7        Q    Do you know when this spreadsheet was
8    created?
9        A    Not -- I do not know when it was
10   specifically created, no.
11       Q    Do you know if this spreadsheet is accurate?
12       A    It -- it is.  I believe that it is, based on
13   the best available information.  I think that Ron
14   Richards, the industrial hygienist for Texaco, speaks to
15   this data and probably can speak better than I to the
16   reliability of such data.
17       Q    Would you agree that the format of Excel
18   spreadsheet that it is in was not available in 1997?
19       A    No, I would not agree.
20       Q    Do you know what year this spreadsheet was
21   created?
22       A    I think this spreadsheet was done recently.
23   There was a larger sheet with data on it that this was
24   derived from, as I understood it.
25       Q    And what -- what sheet are you referring to

1   that had data on it?
2       A   It was a company summary of the data.
3       Q   Okay.  Have you seen that company summary of
4   the data?
5       A   I -- I saw that briefly, yes.  I think there
6   was other --
7       Q   Copy of that company -- company summary of
8   the data?
9       A   No.  There was other data on there, other
10  activities, and we just pulled the data that was relevant
11  to pumpers or gauging.
12      Q   Where did you see that data?
13      A   When I conducted my site visit to the
14  Paradis field.
15      Q   And who showed you the data?
16      A   Mr. Talley.
17      Q   Okay.  And how many pages was that
18  spreadsheet?
19      A   I -- I do not know.
20      Q   And so they -- the defendant showed you a
21  spreadsheet with entries.  How many entries were on that
22  spreadsheet?
23      A   I do not know.
24      Q   Was it much larger than this one?
25      A   Well, I -- yeah, this is -- does not contain

1        BY MR. WILLIAMS:
2        Q    -- 10/31/1977, and it's in Midland District,
3   Texas field.  And do you see where it says, "Crude oil"?
4        A    Well, this is an Industrial Hygiene Sampling
5   Form; is that what you're talking about?
6        Q    Yes, sir.  Do you see where it says, "Crude
7   oil"?
8        A    Yes.
9        Q    Do you see that the sample was only taken
10  for 1.57 minutes?  To the right --
11       A    Yes, I do.
12       Q    -- center of --
13       A    I do.
14       Q    Okay.  And do you see the results on the
15  bottom, the back of the charcoal tube was 61 parts per
16  million for an employee who gauged crude oil?
17       A    Yes.  According to the OSHA regulations and
18  standard, you have to discard this data because something
19  was wrong with the sample.
20       Q    Why is that, Mr. Spencer?
21       A    It has more than 25 percent of a contaminate
22  on the back-up section of the charcoal tube.  So something
23  -- and I think this was one of the data points that
24  Herschel Hobson, the industrial hygienist for Texaco,
25  pointed out where it was data that's not usable and the

```
 1   sampling had to be repeated.
 2         Q    Okay.
 3         A    That happens from time --
 4         Q    But --
 5         A    -- to time.
 6         Q    Let's turn the page.  Do you see the next
 7   sample of crude oil dated 10/31/77, "Employee gauged two
 8   tanks."  And the front sample is 35 parts per million, and
 9   the back --
10         A    Right.
11         Q    -- tube is 35.  So that would give a result
12   of 70 parts per million in the air?
13         A    No.
14         Q    Correct?
15         A    No, that's not correct.  Again, you cannot
16   use this data.  And, again, as pointed out by Herschel
17   Hobson -- who's actually now a plaintiff's attorney --
18   that this data is not usable.  There was something wrong
19   with the collection method or the analytical procedure,
20   something happened.  And, again, any industrial -- any
21   practicing industrial hygienist would know that this is
22   data that you have to discard and redo your sample -- your
23   air sampling.
24         Q    Would the result be 70 parts per million for
25   this sample?
```

1      A    It would not, no.
2      Q    Why not?
3      A    Well, you don't know what it is because
4  there's been an error either in the -- some contamination
5  in the collection method or the analytical procedure.  You
6  -- you cannot simply add them up.  That's a little too
7  rudimentary.
8      Q    Let me ask you this, Mr. Spencer:  If you go
9  out and take a sample with these charcoal tubes, do you
10 add the front result, the back result to have a final
11 result for the benzene exposure?
12     A    If done properly, yes, that's what you do,
13 but it cannot be more than 25 percent.  The back cannot be
14 more than 25 percent of the front.
15     Q    So, if this result was done properly, the
16 result would be 70 parts per million in the air, correct?
17     A    Yeah, but it can't be because the back is
18 more than 25 percent of the -- of the front.
19     Q    Would the wind --
20     A    You can't -- you can't escape that.
21     Q    -- direction --
22     A    You can't escape that issue.
23     Q    -- have -- I'm sorry?
24     A    You cannot escape that issue.  That's --
25 that's the problem.  That's why their industrial hygienist

1   or any competent industrial hygienist wouldn't even point
2   to this data.
3        Q    Okay.  The next one, does the back show 37
4   parts per million?
5        A    It does.  Again, the same reason that --
6   that their industrial hygienist, Herschel Hobson, did not
7   use this data in his assessment and recommended
8   resampling.
9        Q    Okay.  And, if you'd turn to the next one
10  done on October 31st, '77, is the front 33 parts per
11  million while gauging the crude oil tank?
12       A    That is correct.
13       Q    And do you disagree with this result as
14  accurate?
15       A    I -- I do not disagree with this one because
16  it has less than -- actually, that's a non-detect value,
17  3.7.  It's a less-than value.  Only sampling for 2.6
18  minutes, so your limits of detection are very high.
19       Q    But you agree that there's a result of 33
20  parts per million for benzene coming out of a crude oil
21  tank?
22       A    I -- I would agree with that.  Yes, I would
23  agree with this data here, based on the information that I
24  -- that I have.  This says -- okay, yes, I would agree
25  with that.  I mean, you see also --

1    Q    And would --

2    A    -- extraordinarily high concentrations for
3    total hydrocarbons.

4    Q    And would you agree that that 33 parts per
5    million is above the 1970 OSHA standard of 25 -- with a 25
6    parts per million ceiling limit?

7    A    No. It -- it is not. Again, you have to
8    look at what the available technology was in terms of the
9    -- how much time it took to sample to get a 25 part per
10    million limit. So like, for example, if you look at that
11    same year they had a -- a maximum ceiling concentration of
12    50 parts per million. That was for 10 minutes, so this is
13    clearly below. Without even time-weighting this, 2.6
14    minutes to 10 minutes, this is clearly below the maximum
15    allowable concentration of 50.

16    Q    And --

17    A    So, no, it is not above it. It's well below
18    it.

19    Q    Is the 33 part per million above the one
20    part per million OSHA standard?

21    A    Well, it -- it's -- it's above the -- the
22    limit for today. But let's -- let me -- let me time-
23    weight this. Hold on just one minute. It is 0.18. So,
24    yes, it's -- it's -- well, no. I'm sorry. I'm still
25    thinking of something else. No, it's below the -- today's

National Court Reporters, Inc.
Serving Legal Professionals From Coast To Coast
www.nationalcourtreporters.com    Mail@nationalcourtreporters.com
888.800.9656    Fax 866.819.2317

```
 1    eight hour time-weighted average.
 2         Q    Okay.  And you -- and you disagree with the
 3    results in those four --
 4         A    I don't disagree.
 5         Q    -- documents that was produced by Texaco?
 6         A    No.  I absolutely agree with the findings of
 7    the industrial hygienist, and how to properly assess and
 8    analyze that data.  And there was a lot of other data that
 9    the industrial hygienist was -- from Texaco that was also
10    putting in perspective with this data the same data that I
11    have referenced in my reports.  And all that data points
12    to much lower levels of exposure.  So this data, it was an
13    outlier, there were problems with the data, and that's why
14    he didn't use these data points.
15                  (Whereupon, Plaintiff's Exhibit No. 11
16                   was marked for identification.)
17         BY MR. WILLIAMS:
18         Q    Mr. Spencer, if you'd turn to the next
19    exhibit, which is "Benzene Exposure Associated with Tasks
20    Performed on Marine Vessels," by Pamela Williams from
21    ChemRisk --
22         A    Okay.
23         Q    -- dated 2005.  Are you familiar with this
24    paper?
25         A    I have seen this, yes.
```

```
 1                MR. TALLEY:    Object to the --
 2                THE WITNESS:   It -- it depends on where he
 3        selected the air speed from.  What did I do with my --
 4           BY MR. WILLIAMS:
 5        Q    Okay.  But you -- as you sit here today, you
 6   don't know?
 7        A    Well, I -- I'm looking for my report because
 8   it's in there, that defines that.
 9        Q    And while you're looking, I have a question
10   for you about validation.  Didn't we talk about the levels
11   of benzene in the Keener study at the manway?
12        A    Yes.  At the manway, yes.
13        Q    And was the lowest one 80 parts per million?
14        A    Yeah.  In the -- in the head space, yes,
15   that's true.  That has nothing to do with an exposure to
16   an individual that's one foot or three feet away.
17        Q    Okay.  I understand you took a site visit,
18   Mr. Spencer, to the Paradis field?
19        A    Yes.
20        Q    How many times did you go out there?
21        A    I was there once.
22        Q    And what did you do?
23        A    I talked to the workers there -- the pumpers
24   that are there.  I went to the tanks that Mr. Cologne
25   indicated that he gauged.  I walked up on top of the
```

1  catwalk.  I opened up one of the hatches.  I -- I took
2  photographs of those activ -- of those locations.  I spent
3  some time talking to Mr. Matherne about the various
4  activities.
5      Q  Did you perform any air monitoring for
6  benzene?
7      A  I did not.
8      Q  Why not?
9      A  Because we have hundreds of samples already.
10 And I'm not the one making the claim that there was some
11 hazardous level of exposure and using an unvalidated
12 methodology to -- to tell the court that that's the actual
13 level of exposure.
14     Q  And, if those were the same tanks as you --
15 as you've just stated, you could have easily taken an air
16 monitoring device out there and taken samples, couldn't
17 you?
18     A  Well, I don't know that I could easily have
19 done that.  That's up to the -- the -- the company that
20 owns the tank fields now.  It certainly can be done.  And
21 I would think perhaps that would have been a request made
22 by you and your experts, since you're the one claiming
23 that that's the significant source of exposure.
24     Q  Do you know why the plaintiff and his
25 experts weren't invited to -- to your field inspection?

1                MR. TALLEY:  I'm going to object to the
2       form of the question.  And, to the extent that the
3       witness knows, he may answer, but there's no request
4       that's been made in this case.
5                THE WITNESS:  I wasn't aware that I had to
6       invite you.  I was interested in looking what actually
7       occurred in the field, and I -- I guess I make a false
8       presumption that you and your experts would also be
9       interested in -- in understanding the reality of that
10      workplace environment.
11               BY MR. WILLIAMS:
12          Q    Mr. Spencer, were all the same tanks at the
13      field when you visited it in November?
14          A    Well, the same -- they were the same tanks
15      that were there as when Mr. Cologne worked there.  There
16      were some tanks that were removed.  The number one site,
17      number three site -- well, he didn't go to that location.
18      There was another location where all the tanks were
19      removed.  We went to three places and all the -- when we
20      got there, all the tanks had been removed.  But, at the
21      first site, there were three or four tanks which had been
22      removed.  But the ones that were there were the same ones
23      as to when Mr. Cologne was there.
24          Q    And do you have a copy of Mister -- I mean,
25      I'm sorry -- Dr. Nicas' original report here?

1  interviews I did and what I saw there, have not changed.
2          Q    Okay.  And that was going to be my next
3  question.  The gauging of the tanks today is, as you
4  understand it, is more or less same as described by Mr.
5  Cologne back in the '70s?
6          A    Exactly the same.
7          Q    And based on that, how long -- how long --
8  well, do you have credible evidence to suggest that --
9  that the period of time to actually gauge a tank would be
10 something less than two minutes, or in the range of two --
11 in the range of two minutes or less, as opposed to 10
12 minutes?
13         A    Yes.  I mean, that was -- that came from,
14 one, my own experience working with gaugers gauging crude
15 oil tanks, sitting on top of the tanks the same way Mr.
16 Cologne testified to, and -- and making notations in how
17 long that took.  It came from my discussions with Mr.
18 Matherne.  It came from my discussions -- and -- with Ron
19 Richards.  And it came from my discussions with personnel
20 at the Paradis field that conduct gauging using the same
21 techniques on the same tanks today.
22              MR. TALLEY:   No further questions.
23                   R E - E X A M I N A T I O N
24         BY MR. WILLIAMS:                          11:36 A.M.
25         Q    A couple of questions.  Mr. Spencer, if a