# Supplemental Exposure Report for Mr. Chris Cologne

Mark Nicas, PhD, CIH
October 29, 2013

Exhibit 7

## SUMMARY

On May 13, 2103, I submitted to Mr. Eric Williams, Esq., my exposure report for Mr. Cologne. I offered benzene exposure estimates for Mr. Cologne's manual tank gauging activities in the Texaco Paradis Field in the years 1970 through 1976. At the time I submitted my May 13 report, I had not been provided any Texaco benzene monitoring data, nor had I had been provided Mr. Cologne's Texaco employment records. I had asked Mr. Eric Williams to see such records, but he said that none had been provided to him. On June 21, 2013, I was sent a report written by Mr. John Spencer, dated June 17, 2013. Mr. Spencer cited Texaco benzene monitoring data and Texaco personnel records for Mr. Cologne. On June 26, I was sent the Texaco benzene monitoring data Mr. Spencer had cited in his report. On August 21, I was sent Texaco benzene monitoring data that had been referenced but not tabulated in TDPI 001739-1740. On October 18, I was sent an affidavit of Mr. Charles Temple, Jr., signed July 5, 2013. On October 23, I was sent Texaco personnel records for Mr. Cologne. On October 29, I was sent an affidavit of Mr. Charles Temple, Jr., signed October 29, 2013. Based on this information received subsequent to my May 13 report, I am submitting a supplemental report.

My best estimates of Mr. Cologne's 10-minute time weighted average (TWA) benzene exposures while manually gauging crude oil tanks have not changed. Those estimates were listed in Tables 1 and 2 of my May 13 report. For the reasons set forth below, I conclude that the benzene exposure monitoring data produced by Texaco and relied upon by Mr. Spencer pertain to automatic gauging and not manual gauging. However, I do acknowledge uncertainty in the number of days Mr. Cologne performed pumper duties. Based on Mr. Cologne's recall, I estimated that he worked 1,120 days as a pumper; his corresponding cumulative occupational benzene inhalation exposure was 157.1 ppm-years. However, based on Texaco personnel records, Mr. Cologne was not officially promoted into a pumper position until March 1977. If Mr. Cologne worked only three months out of the year as a fill-in pumper in the period 1970-1976, I estimate that Mr. Cologne worked 400 days as a pumper; his corresponding cumulative occupational benzene inhalation exposure would be proportionately reduced to 56.1 ppm-years.

I offer these estimates with a reasonable degree of scientific certainty. I leave open the possibility of revising my opinions and estimates based on additional information.

## THE TEXACO BENZENE MONITORING DATA

Mr. Spencer cited Texaco benzene monitoring data for pumpers collected at sites in Texas starting in late October 1977 and extending into January 1979 (TDPI 001741-1743, 001791-001793, 001796-001799, 001800-001822, 001831). Mr. Spencer assumed that these measurements were representative of Mr. Cologne's benzene exposure as a pumper and as a roustabout in the years 1070-1976. I disagree with Mr. Spencer's assumption.

1

The Texaco measurements were made ten months to two years <u>after</u> the period for which I estimated Mr. Cologne's benzene exposure during manual tank gauging. More importantly, they were made well <u>after</u> federal OSHA issued an emergency temporary benzene standard on May 3,1977. The emergency temporary standard reduced the benzene permissible exposure limits and set forth exposure monitoring and medical surveillance requirements. On May 20,1977, the emergency temporary standard was stayed by the federal Fifth Circuit Court of Appeals, but on May 27,1977, OSHA published a proposed permanent benzene standard with the same exposure limits as set forth in the emergency temporary standard. That Texaco was well aware of the proposed permanent benzene standard is evident in the January 3,1978, memo that Mr. Spencer cited (TDPI 001739-001741). OSHA issued a permanent benzene standard in 1978, but that standard never went into effect and was ultimately vacated by the Courts. The current OSHA benzene standard was issued in 1987.

I conclude that due to the need to comply with the intended reduction in the OSHA benzene exposure limits, by October 1977 Texaco had implemented automatic gauging of its crude oil storage tanks such that manual gauging (opening a hatch and lowering in a steel tape while the pumper's breathing zone was over the opening), as described by Mr. Cologne, was no longer performed. The generally low benzene exposure levels measured by Texaco in October 1977 into January 1979 (usually below the limit of detection of the sampling and analytical method) are consistent with automatic gauging. I note that Mr. Charles Temple, a coworker of Mr. Cologne, stated that some of the tanks in the Paradis field had automatic gauges, but because these gauges did not work they manually gauged the tanks (Affidavit of Charles Temple, Jr., July 5,2013). I also note that one of the reports cited by Mr. Spencer refers to automatic gauging (TDPI 001810). Other than the latter report, none of the Texaco documents cited by Mr. Spencer, and none of the Texaco documents TDPI 003607-003675 from October/November 1977, describe how tank gauging was accomplished.

Of interest is that Texaco documents TDPI 003656, 003657- 003667, and 003671-003675, pertain to 16 short-term personal breathing zone samples (1.57 to 6.8 minutes in duration) during tank gauging on October 31 and November 1,1977. Other than TDPI 003656, the sampling forms state that two to five tanks were gauged during the monitoring. The remaining form TDPI 003656 states that the employee gauged and checked a tank battery that had seven stock tanks. These forms indicate that it took on the order of one minute to gauge one tank (presumably a crude oil tank), whereas Mr. Cologne said it took about ten minutes to manually gauge one crude oil tank, not including the time it took to climb to the top of the tank to access the hatch. The October/November 1977 gauging times were about ten-fold lower than Mr. Cologne's time estimate, and further support my conclusion that the 1977-1980 Texaco monitoring results involved automatic gauging.

I note that on page 5 of Mr. Spencer's report, he cited the January 3,1978, memo that alluded to these same 16 short-term monitoring results (TDPI 001739-001741). Among the 16 short-term samples are the following benzene results: 61 ppm (TDPI 003659), 35 ppm (TDPI 003660), 37 ppm (TDPI 003661), 33 ppm (TDPI 003662), and 16 ppm (TDPI 003667). In Table 1 of Mr. Spencer's report, the highest short-term sample result listed for pumpers is 9.5 ppm (which likely corresponds to the 9.5 ppm result on page TDPI 001813). It seems that Mr. Spencer did not include the 16 ppm to 61 ppm short-term monitoring results from October/November 1977 in his

2

Table 1 even though the Defendant possessed these sample results. A possible reason for the high benzene exposure values while reading a gauge is a leak or spill in the area of the gauge.

I note that in Table 1 of his report, Mr. Spencer indicates there were 53 short-term air samples collected for pumpers in the monitoring records that he cited. He forgot to indicate that among these 53 samples, only 13 samples were clearly noted to involve tank gauging (TDPI 001810, 001818-001819, 001821-001822). As previously described, there are an additional 16 short-term samples for tank gauging that were not cited in Mr. Spencer's report (TDPI 003656, 003657-003667, 003671-003675). Among all 29 short-term samples for tank gauging, the reported values range from <.01 ppm to 61 ppm; 23 results are reported as "less than" values. If one equates all the "less than" sample results with zero, the average of the 29 values is 6.3 ppm benzene, which is 10-fold greater than the 0.62 ppm average value that Mr. Spencer listed in Table I for the 53 short-term samples. In the alternative, if one equates each "less than" sample result with one-half its limit of detection, the average of the 29 values is 6.8 ppm, which is 11-fold greater than Mr. Spencer's 0.62 ppm average value.

In his report on page 9, Mr. Spencer said he spoke with Mr. Doug Matherne who worked in the Paradis field "during the same time frame as Mr. Cologne." Mr. Spencer wrote: "He [Mr. Matherne] reported that tank gauging procedures throughout the 1970 to 1980 period would have remained the same and a pumper and a roustabout in Louisiana would have performed the same tasks and procedures as a roustabout or pumper in Texas." Mr. Spencer provided no notes of this conversation with Mr. Matherne, and to my knowledge Mr. Matherne has not provided a sworn statement or deposition. Mr. Spencer failed to specify the exact "time frame" of Mr. Matherne's work in the Paradis field and failed to provide Mr. Matherne's position with Texaco. According to Mr. Cologne, Mr. Matherne started working in the Paradis field as a production foreman in approximately 1980 (page 101-102, Cologne deposition, April 11,2013). In a response to interrogatories submitted by the Defendants on April 8,2013, it was asserted that Mr. Matherne was a "relief Production Foreman and Production Foreman" in the Paradis field in 1974-1976. Mr. Cologne said it was possible that in 1974 Mr. Matherne "came there maybe for a week of training or something" (page 103, Cologne deposition, April 11,2013). In an affidavit signed October 29,2013, Mr. Charles Temple, Jr. said that Mr. Matherne did not work at the Paradis field in 1970-1976 and was not his supervisor during that period. Mr. Cologne said that Mr. Nugent was at the Paradis field until 1980 (page 103, Cologne deposition, April 11,2013). In addition, Mr. Spencer did not document that Mr. Matherne ever worked in a Texas oil field for Texaco. If Mr. Matherne did not work in a Texas oil field for Texaco, I do not understand how he had first-hand knowledge of Texaco's tank gauging procedures in Texas. Finally, the phrasing "would have remained the same" and "would have performed the same tasks and procedures" that Mr. Spencer attributed to Mr. Matherne seems speculative in nature. Based solely on Mr. Spencer's report, one cannot assume that Mr. Matherne had first-hand knowledge of Texaco's crude oil tank gauging procedures in Texas oil fields in 1977-1980.

In his report on page 6, Mr. Spencer said that "in an effort to understand the gauging of tanks" containing crude oil, he looked at two papers by Moen, et al., which correspond to his reference 28 (labeled Moen 1995a) and reference 29 (labeled Moen 1995b). Mr. Spencer said that in Moen 1995(a), "four long-term samples were collected for benzene during manual tank gauging," with 8-hr TWA vales ranging from .01 to .09 ppm. He said these gauging data were

3

consistent with the Texaco gauging data. However, the data in Moen 1995a are <u>not</u> relevant to Mr. Cologne's gauging activities, and Mr. Spencer's description misrepresented the four 8-hour measurements as pertaining to manual gauging only.

According to Moen 1995a, all the tankers had closed loading systems (the compartment hatches were closed during loading) and "inert gas was used on all the crude oil tankers …" That is, "inert gas … is pumped into the tanks to reduce the risk of fire and explosions." Pumping inert gas into a tank headspace and venting that gas serves to continually purge vapors from the tank headspace. It is akin to pumping air into (and exhausting air from) a room while vapor is being emitted into the room air. The result is that the headspace vapor concentration is kept relatively low. This inert gas purging situation is entirely different from Mr. Cologne's gauging of a previously sealed crude oil tank that was not subject to purging of the headspace vapors, akin to opening up a closed room in which the vapor has been permitted to build up to a relatively high level.

In addition, in the Moen 1995a paper, the description of the manual gauging lacks detail. Other than for one tanker's use of a device termed a "manual moisture control (MCC)" with an "opening … < 25 mm," there is no description of any dimensions of a compartment opening nor of the time it took to gauge a crude oil level in a tank. Table III of the paper lists personal monitoring for "cargo level indication" that involved integrative sampling times of 8 hours. Any 8-hour period may have involved just one gauging episode taking several minutes. Again, there is absolutely no statement that gauging was performed for 8 hours as Mr. Spencer implied. The < 25 mm opening on a MMC device suggests a circular opening about one inch in diameter such that the opening would have area 0.785 square inch or .00545 square foot. In contrast, the hatch opening on a crude oil storage tank described by Mr. Cologne had an estimated area of 2.44 square feet, or a 447-fold greater area than a MMC device.

Mr. Spencer said that in Moen 1995(b), a 10-minute sample and a 193-minute sample were collected during manual gauging "on a crude oil tanker" and that the benzene results were, respectively, 1.15 ppm and 0.21 ppm. Mr. Spencer again said these gauging data were consistent with the Texaco gauging data. However, the data in Moen 1995b are <u>not</u> known to be relevant to Mr. Cologne's crude oil gauging activities, and Mr. Spencer's description misrepresented the cargo being gauged as crude oil. Table 1 of the paper shows that the tanker on which these samples were taken (identified as Ship No. 2) was carrying "leaded gasoline, gasoline, gas-oil." It was <u>not</u> carrying crude oil. Neither Table 3 or the text of the paper indicates what cargoes were being manual gauged during this monitoring on Ship No. 2. In this regard, gas oil is a fuel for boilers and industrial engines. It is intermediate in boiling point between kerosene and fuel oil and would contain very little benzene, unlike crude oil. If the monitored gauging involved gas oil, very little benzene exposure would be expected. As in the Moen 1995a paper, the Moen 1995b paper lacks details of the manual gauging; there is no description of any dimensions of a compartment opening nor of the time it actually took to gauge a tank.

In summary, I conclude that: (i) the Texaco benzene monitoring data are not relevant to Mr. Cologne's manual gauging of crude oil tanks in the Paradis field in 1970-1976; and (2) neither Moen paper is relevant to Mr. Cologne's manual gauging of crude oil storage tanks.

4

## WORK TIME PERFORMING PUMPER DUTIES

In his deposition and affidavit, Mr. Cologne said that: (i) in the years 1970-1972, he worked as a fill-in pumper three months per year; (ii) in the years 1973-1974, he worked every day as a pumper; and (iii) in the years 1975-1976, he worked full time in the pumper job title. Mr. Charles Temple, Jr., stated in his affidavit signed October 29,2013, that: (i) he worked with Mr. Cologne in the Paradis field from 1970 through 1976; (ii) Mr. Cologne worked three months per year as a fill-in pumper in 1970-1972, (iii) Mr. Cologne worked full time as a fill-in pumper in 1973-1974; and (iv) Mr. Cologne worked full time as a pumper in 1975-1976. Mr. Temple's recall supports Mr. Cologne's accounting. However, according to Texaco employment records, Mr. Cologne was temporarily promoted to a pumper position on March 16,1977 (TDPI 000023), and this temporary position was made permanent on November 1,1977 (TDPI 000032).

Based on Mr. Cologne's testimony, I estimated that in the period 1970-1976, he worked a total of 1,120 days as a pumper. The Texaco employment record indicating Mr. Cologne was not promoted to a temporary pumper position until March 1977 does not necessarily mean that Mr. Cologne did not work full time performing pumper duties in the years 1973-1976. It is possible that Mr. Cologne performed pumper duties full time but was paid at a roustabout pay scale.

I consider two alternative scenarios for Mr. Cologne's work as a pumper:

Scenario 1: Mr. Cologne's description is correct and he worked an estimated 1,120 days as a pumper.

Scenario 2: Mr. Cologne worked three months out of the year as a fill-in pumper in the years 1970-1976. In this scenario, I estimate the number of work days as a pumper to be 400 days, or 40 days (in 1970) + [60 days/year × 6 years (in 1971-1976)] = 400 days. If Scenario 2 were true, Mr. Cologne's cumulative benzene exposure would be reduced by 64.3% relative to his cumulative benzene exposure estimated for Scenario 1.

## THE RELIABILITY OF MODELING ESTIMATES

On page 11 of his report, Mr. Spencer stated that he co-authored three papers on validating exposure estimates based on modeling (his cited reference 32, 33 and 34), and alleged the following: "The findings reported in those publications clearly noted extreme variations in modeled outcomes when compared to actual sampling results." To the contrary, none of the cited papers show "extreme variations ... compared to actual sampling results."

Reference 32 is a 2006 paper that I wrote. Benzene-in-air concentrations at Safety-Kleen Corporation recirculating solvent parts washers were compared to values predicted using the NF/FF model. Mr. Spencer's contribution to the paper was providing some benzene measurements made by Safety-Kleen Corporation to which I did not have access at the time, and providing his estimate of a typical air speed value of 30 feet per minute while using Safety-Kleen parts washers. In Table II of reference 32, three modeled benzene concentrations were compared with three measurements. The pairs are respectively: (i) 0.32 ppm predicted versus 0.55 ppm measured; (ii) 0.29 ppm predicted versus 0.28 ppm measured; (iii) 0.25 ppm predicted and

5

0.12 ppm measured. The predicted values are within an approximate range of ½- to 2-fold the measured values. These are not extreme discrepancies.

Reference 34 is a 2007 paper written by Mr. Spencer and Mr. Marc Plisko (Mr. Spencer's employee). It reported measurements of breathing zone (near field) and general room air (far field) cyclohexane concentrations while using that solvent to disassemble a valve on a work bench. Predictions of those same concentrations were made using the NF/FF model. Three different air speeds were generated in a test room for the experiments. For any air speed, variability was observed in the measured benzene concentrations when repeats of the disassembly protocol were conducted. Due to this variability, the authors computed a central 95% confidence interval on the estimated mean of the measurements for each air speed. The authors also performed Monte Carlo simulations for the predicted values to generate a range of modeling estimates. The authors stated the following: "… the predicted range of NF concentrations fell within the 95% confidence interval (CI) of the mean of the actual measurements in Simulation 1 and Simulation 2 … the predicted range of FF concentrations fell within the 95% confidence interval of the mean of the actual measurements in Simulation 1 and Simulation 2. For Simulation 3, the modeled predictions underestimated the measured concentrations for bot the NF and FF condition." In summary, the modeling estimates either fell within the statistical confidence interval for the measured values, or underestimated the measured values. According to the paper, in Simulation 3, the modeled estimates were about 2/3-fold the value of the measurements. Figures 4 and 5 of the paper show good agreement between the means of the predicted and measured concentrations. How these data support Mr. Spencer's claim about "extreme variations" between predicted versus measured values is not comprehensible.

Reference 33 is a 2008 paper written by Mr. Spencer and Mr. Marc Plisko. It reported the results of the same study described in Reference 34, and reported results of another study using a recirculating solvent parts washer. Table 2 of the paper listed measured and predicted benzene concentrations in the NF and the FF of the parts washer on three successive days. The pairs of NF values over the three days are, respectively: (i) 0.5 mg/m$^3$ predicted versus 0.5 mg/m$^3$ measured; (ii) 0.4 mg/m$^3$ predicted versus 0.24 mg/m$^3$ measured; and (iii) 0.35 mg/m$^3$ predicted versus 0.34 mg/m$^3$ measured. The predicted NF values are within an approximate range of 1- to 1.67-fold the measured values. Note that 1-fold signifies no difference. These are not extreme discrepancies. The pairs of FF values over the three days are, respectively: (i) 0.21 mg/m$^3$ predicted versus 0.29 mg/m$^3$ measured; (ii) 0.16 mg/m$^3$ predicted versus 0.15 mg/m$^3$ measured; and (iii) 0.15 mg/m$^3$ predicted versus 0.20 mg/m$^3$ measured. The predicted FF values are within an approximate range of 0.69- to 1.07-fold the measured values. These are not extreme discrepancies.

In summary, Mr. Spencer's assertion that the papers he co-authored show "extreme variations in modeled outcomes when compared to actual sampling results" is negated by the data in the same papers. In fact, these papers indicate that the NF/FF model provides reasonable predictions of airborne exposure levels. This is hardly surprising given that the NF/FF model is an accepted exposure assessment method in the industrial hygiene profession.

To account for uncertainty in the modeling inputs for my estimates of Mr. Cologne's benzene exposure levels, I performed a Monte Carlo simulation and reported those results in my May 13 report. Monte Carlo simulation is an accepted method for quantifying uncertainty in mathematical modeling estimates. The uncertainty interval generated by Monte Carlo simulation is a type of "error rate."

I note that the wind speeds recorded on TDPI 001821 and TDPI 003642-003675 span the range from zero to 30 miles per hour. These documents do not specify how the wind speeds were measured nor the height above ground level at which they were measured. Wind speeds are usually measured at about 30 feet above ground level, and it is known that wind speed decreases as one moves closer to the ground. Mr. Cologne stated that the crude oil tanks in the Paradis field were about 16 feet tall. In my original Monte Carlo analysis, I assumed that the average wind speed for Mr. Cologne's tank gauging was 5 mph but might range from 2 mph to 8 mph. Combined with uncertainty in the true values for the average mass fraction of benzene in crude oil, the average volume of the tank headspaces, and the average number of work days per calendar year, I found that the 95% probability interval around the point estimate of 157 ppm-years was 46.4 to 315 ppm-years, and the lower one-sided 95% probability interval was 56.4 ppm-years.

I reran the Monte Carlo analysis assuming that the average wind speed for Mr. Cologne's tank gauging was 5 mph but might range from close to 0 mph to 30 mph, or the extremes of the reported wind speeds on the Texaco documents. I did not change the distributions of the other inputs. I found that the 95% probability interval around the point estimate was 33.6 to 500 ppm-years, and the lower one-sided 95% probability interval was 43.3 ppm-years.

Signature: *Mark Nicas*     Date: 10/29/13