

8805 Columbia 100 Pkwy
Suite 100
Columbia, MD 21045    27 November 2013

(410) 740-9600
FAX (410) 740-9606

www.episervices.com

Exhibit 13

Patrick A. Talley, Jr., Esq.
Phelps Dunbar, LLP
365 Canal Street
Suite 2000
New Orleans, Louisiana 70130-6534

Re:    **Chris and Catherine Cologne v. Shell Oil Company, et al.**
       **EPI Project No. 213274**
       **Supplemental Report**

Dear Mr. Talley:

This supplemental report has been prepared at your request following my review of Dr. Nicas's supplemental report, the 3 July 2013 Deposition of Dr. Kopstein, the 8 October 2013 Deposition of Ronald Richards, and a review of Texaco air monitoring data collected from Louisiana oil fields between 1977 and 1997. Additionally, I conducted a site visit at the Paradis field on 6 November 2013, where Mr. Cologne worked, and evaluated the procedures associated with tank gauging. Based on this additional information, the opinions outlined in my original 17 June 2013 Summary Report have been further supported by the aforementioned facts. Specifically, my opinions are:

- Dr. Nicas has failed to validate the use of his modeling methodology as applied to Mr. Cologne's tank gauging tasks. His modeling results are contrary to all the air sampling data collected by Texaco during similar operation in both Louisiana and Texas.

- During Mr. Cologne's Texaco work history between 1970 and 1976, the facility used industrial hygiene practices and sampling techniques that corresponded with the knowledge and technology of the time in order to quantify occupational exposures. In fact the very same procedures continue to be used at the tank batteries where Mr. Cologne worked.

- Based on the historical Texaco air sampling data from 1978 and 1979 and the description of Mr. Cologne's responsibilities and tasks, it is my opinion that his overall exposure to benzene while working as a roustabout and as a pumper for Texaco was well below the benzene occupation health standard of the time and today.

- Considering the mean long term benzene exposure data for Texaco pumpers and roustabouts collected in 1978 and 1979 and the time Mr. Cologne spent working in those capacities, his cumulative benzene exposure for the period between 1970 and 1976 would have been in the range of 0.643 ppm-years to 0.88 ppm-years.

Chris and Catherine Cologne v. Shell Oil Company, et al.
Supplemental Report
EPI Project No. 213274
Page 2

- Dr. Kopstein has criticized Texaco management in that they were aware of the health risks associated with benzene exposure and failed to properly warn and protect their employees. Documents relied upon by Dr. Kopstein to form this opinion were either irrelevant or did not support his opinion. Contrary to Dr. Kopstein's opinion, Texaco properly evaluated benzene exposures for workers employed in the same capacity as Mr. Cologne and found that overall, benzene exposures were below the benzene action level. This is evidenced by the fact that the workers I observed during my site visit currently conduct the same manual tank gauging procedures as described by Mr. Cologne. Regarding Dr. Kopstein's opinion on the benzene content of crude oil, he has provided no affirmative information that the analysis of benzene in crude oil conducted by Texaco or Grizzle, et al. (1979) was inaccurate.

## Dr. Nicas's Supplemental Exposure Report

### Gauging Process

I visited the Paradis field where Mr. Cologne worked on 6 November 2013 with Douglas Mathern, evaluated the manual gauging tools, tank hatch openings and procedures, and later spoke with Ronald Richards regarding this field and the Texas fields. Mr. Mathern, worked as a Texaco pumper for 10 years at Garden Island Bay, was the production foreman for Harvey District in 1974 (which included the Paradis field), and was the assistant to the production foreman for Paradis field in 1975. According to Mr. Richards, the oil field batteries and associated tanks in both Texas and Louisiana would have been the same configuration and applied the same techniques and tools for gauging. (Ronald Richard Personal Conversation).

Mr. Mathern, who was familiar with the tanks and the gauging process, stated that while some tanks in some locations, would have been fitted with automatic gauging systems, they were not used because they were not accurate (Douglas Mathern Personal Conversation). Both Mr. Mathern and Mr. Richards stated that automatic gauging would not work with crude oil because of the sand content and other materials contained in the crude (Ronald Richard Personal Conversation; Douglas Mathern Personal Communication). Mr. Cologne's coworker, Mr. Temple, also noted that "*some of the tanks had automatic gauges, but they did not work, so we had to manually gauge the tanks. We never used automatic gauges*" (5 July 2013 Affidavit of Charles Temple, Jr.).

For his model, Dr. Nicas relied upon Mr. Cologne's testimony that he conducted manual gauging of crude oil tanks and that the gauging task took 10 minutes. While I acknowledge that Mr. Cologne performed manual gauging of crude oil tanks, observation of actual tank gauging found that it took less than a minute to a couple of minutes to complete the process. During my 6 November 2013 site visit I was told that workers at the facility manually gauge tanks the same today as when Mr. Cologne worked there. Their standard operating procedure was to stand to the side of the tank opening when gauging. According to onsite personnel and Mr. Mathern the

Chris and Catherine Cologne v. Shell Oil Company, et al.
Supplemental Report
EPI Project No. 213274
Page 3

actual process of gauging a tank, lowering the steel tape, reeling it in, and reading the tape would take about one minute, and less than five minutes if thieving a sample, not the 10 minutes that Mr. Cologne has indicated.

### Representativeness of Texaco Sampling Data

Dr. Nicas disagreed with the assertion in my 17 June 2013 report that the Texaco benzene monitoring data collected in Texas between October 1977 and January 1979 were representative of Mr. Cologne's benzene exposure when he worked as a pumper and roustabout between 1970 and 1976.  To support his opinions, Dr. Nicas cited Texaco's knowledge of the 3 May 1977 OSHA Emergency Temporary Standard (ETS) for benzene and his review and reliance on additional Texaco monitoring documents (CologneTDPI003656-CologneTDPI003667 and CologneTDPI003671-CologneTDPI3675).

Dr. Nicas guessed that in order to comply with OSHA's benzene regulations, by October 1977 Texaco had installed automatic gauging on its crude oil storage tanks so that manual gauging was no longer performed.  While it was clear that Texaco was aware of OSHA's activities in the areas of benzene regulations in the 1977 and 1978 time frame, there is no evidence that Texaco installed automatic gauging equipment on its tanks as a means to comply with OSHA's proposed reduction in the benzene occupational exposure limit.

According to Ronald Richards, Texaco's former Manager of Industrial Hygiene and Toxicology between 1971 and 1982, when OSHA issued the benzene ETS in 1977 Texaco formed a benzene committee and began evaluating process streams for benzene content and evaluating its employee's benzene exposures (Ronald Richard Personal Conversation).  Texaco employees who worked with or around crude oil were included in this exposure evaluation.  Mr. Richards stated that during the period between 1970 and 1976 he directed Texaco personnel to collect air samples on representative oil field workers in order to assess their exposures to benzene (20 May 2009 Deposition of Ronald Richards, page 22).

Mr. Richards testified that air samples were collected in the oilfields and noted that he had conducted numerous industrial hygiene walk-throughs in oilfields throughout the United States, including Louisiana and Texas (20 May 2009 Deposition of Ronald Richards, page 27).  Mr. Richards recalled going to the New Orleans division and visiting several gas plants and onshore and offshore oil-producing operations (20 May 2009 Deposition of Ronald Richards, page 86).  He is familiar with the Paradis field where Mr. Cologne claimed he worked.  He visited that field as early as 1970 (8 October 2013 Deposition of Ronald Richards, page 25).

As part of OSHA's 1978 proposed benzene regulations, Texaco provided OSHA with comments and data (CologneTDPI002693-CologneTDPI002725).  In this document Texaco addressed both the airborne concentration of benzene associated with crude oil as well as the benzene content of crude oil.  Regarding the airborne concentration of benzene, Texaco stated:

Chris and Catherine Cologne v. Shell Oil Company, et al.
Supplemental Report
EPI Project No. 213274
Page 4

> *Air monitoring involving 426 samples from Texaco's crude oil and natural gas*
> *production operations shows an average [benzene] exposure of 0.0625 ppm; the*
> *range of exposure was from zero to 3 ppm.  The data in Attachment I show that*
> *only eight air samples 1.8% were above the 0.5 ppm action level.*

Regarding the benzene content of crude oil, Texaco stated:

> *The airborne benzene concentrations discussed in the preceding paragraph and*
> *show in Attachment I should also be considered in light of the benzene content of*
> *the liquids (crude oil and gas condensate) being handled.  The benzene content of*
> *338 liquid crude oil and gas condensate samples averaged 0.28 volume percent.*
> *Again, this value should be used in reference for the worker exposures shown in*
> *Attachment I.  Even though the benzene content of liquids being handled through*
> *oil and gas well equipment, pumps, storage and transmission facilities exceeds*
> *0.1%, actual worker exposure in all but 1.8 percent of samples is well below the*
> *action level of 0.5 ppm.*

When only considering the benzene content of crude oil, Texaco reported that average benzene
content was 0.21% v/v (CologneTDPI002693-CologneTDPI002725).

I have also been provided with benzene air sampling data that was collected in Louisiana oil
fields between May 1977 and May 1997 (CologneTDPI003714).  Included in this database were
11 short term samples (15 to 20 minute samples) that were collected while performing tank
gauging tasks in 1978, 1994, and 1997.  The benzene concentrations ranged from <0.02 ppm to
1.7 ppm with a mean of 0.34 ppm.  These short term benzene sample results collected in
Louisiana oil field workers are consistent with the 53 short term samples collected on pumpers
working in Texas oil filed in 1978 and 1979.  As noted in my original report, these 53 benzene
sample concentrations ranged from <0.01 ppm to 9.5 ppm with a mean of 0.62 ppm.

In 1999 (West Bay, Louisiana) I conducted an exposure assessment of an individual gauging
crude oil tank using the same tools and techniques described by Mr. Cologne (West Bay
Sampling Data).  During my survey we monitored the crude oil production employees for
benzene.  Manual gauging of the 100-barrel crude oil tanks was conducted with a metal tape
through an eight to ten inch hatch.  The first tank that was gauged and sampled had a hatch that
was located at floor height and the task period was three minutes.  The resulting benzene
concentration was 1.8 ppm.  The second tank that was gauged was an elevated tank, similar to
the tanks described by Mr. Cologne.  This gauging task took three minutes and was repeated four
times during the sampling period.  The resulting benzene concentration was <0.23 ppm.  It is
expected that the benzene content of this crude oil would be consistent with those reported by
IARC (1989) and by Texaco of approximately 0.2% for the Louisiana area
(CologneTDPI002693-CologneTDPI002725).  This data is consistent with the results of
Texaco's air sampling conducted in both Texas and Louisiana.

Chris and Catherine Cologne v. Shell Oil Company, et al.
Supplemental Report
EPI Project No. 213274
Page 5

Texaco's oil production benzene air sampling data is consistent with OSHA findings that they incorporated into the 1987 Benzene Standard (Federal Register 1987). As part of that standard, OSHA chose to exempt oil and gas drilling, production, and servicing operations similar to those where Mr. Cologne worked (Federal Register 1987). OSHA stated:

> *OSHA proposed to exempt oil and gas drilling, production and servicing operations from the benzene standard. The basis for the exclusion was that exposures under the action level and intermittent.*

**Texaco Short-Term Sampling Data**

According to Dr. Nicas, I did not include 16 short term sample results in my original report. As noted in my report I cited sampling conducted by Texaco in October and November 1977 which included these 16 samples and stated that "*specific details regarding the tasks and product for each individual sample results were not available.*" Texaco's employee, Herschel Hobson, who wrote the memorandum (CologneTDPI001739-Cologne TDPI001740) regarding the data, included the 16 short term sample results stated:

> *In addition to the above samples, a total of sixteen (16) short term samples were collected in the Andector and Kermit areas during tank gauging. Due to the majority of these samples representing sample periods of less than three (3) minutes, the results are very suspect and therefore, these findings are not reported.*
>
> *It is recommended that future short term sampling be conducted for a minimum of fifteen (15) minutes with a sampling rate exceeding 100 cubic centimeters per minute. Furthermore, since detectable benzene levels were found in both producing areas, it is recommended that this gauging procedure be resampled over a longer time interval and at the higher sample rate on the next survey.*

Now, after having reviewed the complete data set (CologneTDPI003656-CologneTDPI003667 and CologneTDPI003671-CologneTDPI3675), it is clear why Mr. Hobson felt that the results were suspect. My review of this data found the following issues:

- The results show very high limits of detection for benzene (<0.76 ppm to <6.1 ppm)
- The data contained on the front and back sections of the charcoal tubes are not consistent. For example, samples 1121-018 and 1121-020 showed non-detectable concentrations of benzene on the front portion of the sampling tube and detectable benzene concentrations on the back section of the sampling tube, while the hydrocarbon results showed detectable concentrations on the front section of the sampling tube and non-detectable concentrations on the back section of the sampling tube.

Chris and Catherine Cologne v. Shell Oil Company, et al.
Supplemental Report
EPI Project No. 213274
Page 6

- Analysis for benzene and hydrocarbons on a sample were inconsistent. For example, samples 1121-019 and 1121-026 showed detectable concentrations of benzene and no detectable concentrations of hydrocarbons on the sampling tubes. Total hydrocarbons are found with benzene when monitoring crude oil exposures.

It is a well-known and standard industrial hygiene requirement that when sampling hydrocarbons using sorbent tubes such as charcoal tubes, vapor breakthrough can occur. During the analysis, if the concentration of analyte found on the back section of the charcoal tube is equal to or greater than 25% of the concentration found on the front section, the charcoal tube is considered to be saturated and reported as such on the analyst worksheet (OSHA Method 7).
Dr. Nicas attributed the elevated values to possible leaks or spills in the area of the "gauge". However, a review of the notes on the sampling documents failed to indicate that there were any leaks or spills. It is important to note that one must have a sufficient understanding of the work area to properly support hypothetical scenarios. For example there is not a location on top of a crude oil storage tank for material to pool or leak. The industrial hygienist's sampling documentation did state that the samples were collected under normal operations.

### Moen, et al. Citations

In my original report, I cited two papers related to gauging tanks on tankers in an effort to reinforce the validity of the Texaco data. Moen, et al. (1995a) evaluated benzene exposures during various activities aboard crude oil tankers. The benzene content was not reported. Four long term samples were collected for benzene during manual tank gauging and the 8-hour time-weighted average concentrations ranged from 0.01 to 0.09.

One of the four samples used a Marine Moisture Control (MMC) device, which is a closed system sampling device to gauge tanks. The three other samples were collected by crewmembers who manually gauged the tanker's tanks. "*Manual cargo level indication with a metal stick fastened to a rope was performed by different members of the crew; able seamen, mates, and a trainee*" and those results ranged from 0.01 ppm to 0.03 ppm.

Moen, et al. (1995b) provided a short term sample (10 minute) result and a long term sample (193) result during the manual gauging on a tanker carrying leaded gasoline, gasoline, and gas oil, which I mistakenly reported as carrying crude oil. According to the authors, gasoline in Norway may contain as much as 5% benzene and gas-oil had a lower benzene content, less than 0.02%. The short term benzene concentration was 1.15 ppm and the long term benzene concentration was 0.21 ppm. While the products on the ship did not include crude oil, the range of benzene contents of these products encompassed the benzene content of crude oil.

Chris and Catherine Cologne v. Shell Oil Company, et al.
Supplemental Report
EPI Project No. 213274
Page 7

### Model Validation

Dr. Nicas made no attempt to validate the NF-FF model as applied to the crude oil exposure using available air monitoring data. Validation is the required scientific methodology for supporting modeled values (AIHA 2009; Jayjock et al. 2011; EPA 2005). Even in his supplemental report, Dr. Nicas made no effort to validate his model or exposure reconstruction using available air sampling data.

Instead of addressing the validation of his modeling results, Dr. Nicas takes issue with the following text:

> *I have authored or co-authored several papers focused on validating calculated,*
> *modeled assessments (Plisko and Spencer 2008; Spencer and Plisko 2007; Nicas,*
> *et al. 2006). The findings reported in those publications clearly noted extreme*
> *variations in modeled outcomes when compared to actual sampling results. Such*
> *variations between modeled and actual data are the direct result of the model*
> *input variables. A change in wind speed, wind direction, or benzene content, has*
> *a very significant impact on the reported exposure level. Validating your*
> *modeled outcomes is required to have the confidence you reporting reliable data.*
> *Consequently, the exposure values generated by Dr. Nicas are not reliable.*

Dr. Nicas has missed the significance of the validation issue. The determination of "extreme" when modeling is based on the variables input into the model. Without having been on-site, without having actually quantifying the gauging task time, and further relying upon hypothetical crude oil benzene content data, instead of actual data, Dr. Nicas did not properly validate his modeled calculation with actual field data. For example, if you change the task time from 10 minutes to 1 minute his calculated value is decreased by 10 times. If you change the wind speed from 5 miles per hour to 10 miles per hour then his calculation is reduced by a factor of two.

As noted in my original report, in order to illustrate the importance of model validation I compared Dr. Nicas's modeled results with Texaco's actual air monitoring data. Dr. Nicas estimated benzene 8-hour time-weighted average exposures based on the lowest modeled tank gauging exposures. His estimated benzene 8-hour time-weighted average exposures ranged from 11.6 ppm to 21.1 ppm. Comparing his modeled values to the Texaco average pumper benzene 8-hour time-weighted average exposure of 0.08 ppm shows that his modeling methodology was not reliable because it overestimated exposures by a factor of 145 to 263.

### Dr. Kopstein

I have reviewed Dr. Kopstein's 9 May 2013 report and 3 July 2013 deposition. In both his report and his deposition, Dr. Kopstein criticized Texaco management in that they were aware of the health risks associated with benzene exposure and failed to properly warn and protect their

Chris and Catherine Cologne v. Shell Oil Company, et al.
Supplemental Report
EPI Project No. 213274
Page 8

employees.  Dr. Kopstein based his opinions regarding the lack of training, warnings, and
personal protective equipment on Mr. Cologne's deposition and the fact that Texaco was aware
of the health risks of benzene (Deposition of Melvyn Kopstein, page 50).  Unfortunately,
documents relied upon by Dr. Kopstein to form this opinion were either irrelevant or did not
support his opinion.  Contrary to Dr. Kopstein's opinion, Texaco properly evaluated benzene
exposures for workers employed in the same capacity as Mr. Cologne and found that overall,
benzene exposures were below the benzene action level.  This is evidenced by the fact that the
workers I observed during my site visit currently conduct the same manual tank gauging
procedures as described by Mr. Cologne.

As previously noted, Texaco's oil production benzene air sampling data is consistent with OSHA
findings that they incorporated into the 1987 Benzene Standard (Federal Register 1987).  As part
of that standard, OSHA chose to exempt oil and gas drilling, production, and servicing
operations similar to those where Mr. Cologne worked (Federal Register 1987).

Dr. Kopstein has provided no affirmative information that the analysis of benzene in crude oil
conducted by Texaco or Grizzle, et al. (1979) was inaccurate.

## Summary of Opinions

Based upon my review of the additional documents and my 6 November 2013 site visit to the
Paradis field, the opinions outlined in my 17 June 2013 report have not changed.  Specifically,
my opinions are:

- Dr. Nicas has failed to validate the use of his modeling methodology as applied to Mr.
  Cologne's tank gauging tasks.  His modeling results are contrary to all the air sampling
  data collected by Texaco during similar operation in both Louisiana and Texas.

- During Mr. Cologne's Texaco work history between 1970 and 1976, the facility used
  industrial hygiene practices and sampling techniques that corresponded with the
  knowledge and technology of the time in order to quantify occupational exposures.  In
  fact the very same procedures continue to be used at the tank batteries where Mr.
  Cologne worked.

- Based on the historical Texaco air sampling data from 1978 and 1979 and the description
  of Mr. Cologne's responsibilities and tasks, it is my opinion that his overall exposure to
  benzene while working as a roustabout and as a pumper for Texaco was well below the
  benzene occupation health standard of the time and today.

- Considering the mean long term benzene exposure data for Texaco pumpers and
  roustabouts collected in 1978 and 1979 and the time Mr. Cologne spent working in those

Chris and Catherine Cologne v. Shell Oil Company, et al.
Supplemental Report
EPI Project No. 213274
Page 9

capacities, his cumulative benzene exposure for the period between 1970 and 1976 would
have been in the range of 0.643 ppm-years to 0.88 ppm-years.

- Dr. Kopstein has criticized Texaco management in that they were aware of the health
  risks associated with benzene exposure and failed to properly warn and protect their
  employees. Documents relied upon by Dr. Kopstein to form this opinion were either
  irrelevant or did not support his opinion. Contrary to Dr. Kopstein's opinion, Texaco
  properly evaluated benzene exposures for workers employed in the same capacity as Mr.
  Cologne and found that overall, benzene exposures were below the benzene action level.
  This is evidenced by the fact that the workers I observed during my site visit currently
  conduct the same manual tank gauging procedures as described by Mr. Cologne.
  Regarding Dr. Kopstein's opinion on the benzene content of crude oil, he has provided no
  affirmative information that the analysis of benzene in crude oil conducted by Texaco or
  Grizzle, et al. (1979) was inaccurate.

My opinions are to a reasonable degree of scientific certainty and are based on my more than 36
years of experience as an industrial hygienist and safety professional. My experience has
included health hazard evaluations and audits of multiple operations within facilities similar to
those where Mr. Cologne was employed. My experience has also included the development of
exposure assessment strategies, training of employees who worked in numerous industrial
operations, my prior work as a member of the AIHA's Product Safety and Health Committee,
and my current membership in the Society for Chemical Hazard Communication. I also base my
opinions upon portions of the scientific literature focused on hazard communication and
occupational health hazard assessment.

For purposes of this report, I have reviewed numerous documents, articles, studies and
publications, which include but are not limited to the following:

1. Deposition of Chris Cologne, dated 11 April 2013.

2. Affidavit of Chris Cologne, dated 9 May 2013.

3. Affidavit of Charles Temple, Jr., dated 5 July 2013.

4. Texaco Production Documents (CologneTDPI000305-CologneTDPI002991).

5. Texaco Production Documents (CologneTDPI003607-CologneTDPI003675).

6. Texaco Production Document (CologneTDPI003714).

7. Cologne Texaco Employee File (CologneTDPI000001-CologneTDPI000304).

Chris and Catherine Cologne v. Shell Oil Company, et al.
Supplemental Report
EPI Project No. 213274
Page 10

8.   Mark Nicas, PhD, CIH, Expert Report, dated 13 May 2013.

9.   Mark Nicas, PhD, CIH, Supplemental Exposure Report of Mr. Chris Cologne, dated 29 October 2013.

10.  Melvyn Kopstein, PhD, Expert Report, dated 9 May 2013.

11.  Deposition of Melvyn Kopstein, PhD, taken 3 July 2013.

12.  Deposition of Ronald Richards in Frauenberger v. Texaco, taken 20 May 2009.

13.  Deposition of Ronald Richards, taken 8 October 2013.

14.  West Bay Air Sampling Data.

15.  American Industrial Hygiene Association (AIHA). 2009. *Mathematical Models for Estimating Occupational Exposure to Chemicals.* Keil, Simmons, Anthony, Eds. Second Edition.

16.  Environmental Protection Agency (EPA). 2005. Appendix W to Part 51 – Guideline on Air Quality Models.

17.  Federal Register. 34460-34578. Department of Labor, Occupational Safety and Health Administration. 29 CFR Part 1910. Occupational Exposure to Benzene; Final Rule. 11 September 1987.

18.  Grizzle, P.L. and Coleman, H.J. 1979. "Gas Chromatographic Determination of Benzene and Toluene in Crude Oils." *Analytical Chemistry.* 51:602-608.

19.  International Agency for Research on Cancer (IARC). 1989. *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Occupational Exposure in Petroleum Refining; Crude Oil and Major Petroleum Fuels.* Volume 45. IARC, Lyon, France.

20.  Ignacio, J.S. and Bullock, W.H. 2006. *A Strategy for Assessing and Managing Occupational Exposures.* AIHA Press, Fairfax, VA, Third Ed.

21.  Jayjock, M.A., Armstrong, T., Taylor, M. 2011. "The Daubert Standard as Applied to Exposure Assessment Modeling Using the Two-Zone (NF/FF) Model Estimation of Indoor Air Breathing Zone Concentration as an example." *Journal of Occupational and Environmental Hygiene.* 8:D114-D122.

Chris and Catherine Cologne v. Shell Oil Company, et al.
Supplemental Report
EPI Project No. 213274
Page 11

22.  McMillen, S.J., Magaw, R.I., Carovillano, R.L.  2001.  *Risk-Based Decision-Making for Assessing Petroleum Impacts at Exploration and Production Sites*.

23.  Moen, B.E., Hollund, B.E., Berntsen, M., Flo, R., Kyvik, K.R., Rilse, T.  1995a. "Occupational Exposure of Deck Crews to Carcinogenic Agents on Crude Oil Tankers." *American Journal of Industrial Medicine*.  27:555-564.

24.  Moen, B.E., Hollund, B.E., Berntsen, M., Flo, R., Kyvik, K.R., Rilse, T.  1995b. "Exposure of the Deck Crew to Carcinogenic Agents on Oil Product Tankers." *Annals of Occupational Hygiene*.  3:347-361.

25.  Nicas, Mark, Plisko, M.J., Spencer, J.W.  2006.  "Estimating Benzene Exposure at a Solvent Parts Washer." *Journal of Occupational and Environmental Hygiene*. 3:284-291.

26.  Plisko, Marc J. and Spencer, J.W.  2008.  "Evaluation of a Mathematical Model for Estimating Solvent Exposure in the Workplace." *Journal of Chemical Health and Safety*. 15:14-21.

27.  Spencer, John W., Plisko, M.J.  2007.  "A Validation Study of a Mathematical Model for Estimating Solvent Exposures During the Disassembly of Metal Parts." *Journal of Occupational and Environmental Hygiene*.  4:253-259.

This supplemental report is based on the information available to me at this time.  Should additional information become available, I reserve the right to determine the impact, if any, of the new information on my opinions and conclusions, including the opinion and conclusions regarding Mr. Cologne's benzene exposure, and to revise my opinions and conclusions if necessary.

Sincerely,

John W. Spencer, CIH, CSP
President

JWS/mln